**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| Florida Action Committee, Inc.,<br><br>*Plaintiff*,<br><br>vs.<br><br>Mark Glass, *in his official capacity as Commissioner of the Florida Department of Law Enforcement*;<br><br>*the Florida counties of* Brevard, Broward, Calhoun, Citrus, Clay, Columbia, Flagler, Hendry, Hernando, Holmes, Indian River, Jackson, Lake, Lee, Levy, Marion, Martin, Miami-Dade, Okeechobee, Osceola, Palm Beach, Pasco, Polk, Putnam, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Union, Volusia, *and* Washington;<br><br>*and the Florida cities of* Boca Raton, Cape Coral, Coral Springs, Davie, Fort Lauderdale, Fort Myers, Gainesville, Hollywood, Jacksonville, Miramar, Orlando, Pembroke Pines, Pompano Beach, Sunrise, *and* West Palm Beach,<br><br>*Defendants*. | No. 4:26-cv-388 (MW/MJF) |

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Florida Action Committee, Inc. brings this complaint against Mark Glass, in his official capacity as Commissioner of the Florida Department of Law Enforcement (FDLE); the Florida counties of Brevard, Broward, Calhoun, Citrus, Clay, Columbia, Flagler, Hendry, Hernando, Holmes, Indian River, Jackson, Lake, Lee, Levy, Marion, Martin, Miami-Dade, Okeechobee, Osceola, Palm Beach, Pasco, Polk, Putnam, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Union, Volusia, and Washington; and the Florida cities of Boca Raton, Cape Coral, Coral Springs, Davie, Fort Lauderdale, Fort Myers, Gainesville, Hollywood, Jacksonville, Miramar, Orlando, Pembroke Pines, Pompano Beach, Sunrise, and West Palm Beach, and alleges based on personal knowledge or information and belief as follows:

# TABLE OF CONTENTS


Introduction ..... 3

Jurisdiction and Venue ..... 10

Plaintiff and Standing ..... 10

Defendants ..... 12

Factual Allegations ..... 15

A. Florida's sex-offender registration scheme ..... 15

1. General registration requirements ..... 17

2. Residency restrictions ..... 21

3. Presence restrictions ..... 26

B. Practical effects of the scheme on registrants ..... 32

C. Interagency coordination to enforce the scheme ..... 36

D. The punitive nature of Florida's sex-offender registration scheme ..... 42

1. Retribution and shaming ..... 43

2. Incapacitation ..... 45

Claims for Relief ..... 57

Count 1: Violation of the Eighth Amendment ..... 57

Count 2: Conspiracy to Violate the Eighth Amendment ..... 59

Count 3: Violation of the *Ex Post Facto* Clause ..... 60

Count 4: Violation of the Right to Travel ..... 61

Count 5: Violation of the Right to Loiter for Innocent Purposes ..... 62

Count 6: Violation of the Vagueness Doctrine ..... 63

Count 7: Violation of the Right to Free Speech ..... 65

Prayer for Relief ..... 66

## INTRODUCTION

1. When someone is convicted of a crime, a judge imposes a sentence, the person serves it, and the matter is then supposed to be done and over with; the offender's debt to society is paid, and he may reintegrate and return to normal life. That is, unless the crime is an offense that requires registration as a sex offender. Long after such a person has served his sentence, completed any probation or supervised release, and paid all fines, costs, or restitution, the State of Florida, its counties, cities, towns, and villages carry on subjecting him to a life-long regime of crushing punishments that restrict virtually every aspect of daily life. What began as a straightforward system of public notification under the so-called "Megan's Law" of 1996 has evolved over the past three decades into something wholly different: a complex system of endless governmental supervision, exclusion zones, speech bans, and travel restrictions so far-reaching and severe that they leave vast swaths of the State effectively off-limits and make ordinary participation in family and civic life essentially impossible.

2. Florida and its counties and municipalities have transformed the State's sex-offender registration scheme from a recordkeeping and notice tool into a system of perpetual punishment. They tell registrants where they may and may not live, where they may and may not be present, when they may and may not travel, what they may and may not say, and when they must appear

in person before law enforcement—all subject to the threat of incarceration for even the slightest misstep.

3. For many, the practical effect is not just ceaseless supervision; it is akin to banishment. Entire neighborhoods, cities, and counties are practically inaccessible. Family homes, jobs, parks, beaches, libraries, and last-minute trips to visit loved ones are placed beyond reach. The resulting system is no mere civil "collateral consequence" of a conviction—it is a lifelong punishment, often effectively banishment, that follows individuals long after they have completed their sentences and repaid their debts to society.

4. The Federal Constitution does not allow this. To start, the Eighth Amendment forbids punishments that are cruel and unusual. Banishment has long stood among the most severe forms of non-lethal punishment known to Anglo-American law. Today, it is a quintessentially unconstitutional penalty. Taken as a whole, Florida's registration scheme imposes punishment very much like banishment, even if not in name. Through a series of overlapping residency and presence restrictions, it drives registrants from entire cities and counties, consigning them to the outskirts of every major population center in the State—often to homelessness, isolation, and perpetual displacement. A State may not, either alone or with its political subdivisions, evade constitutional limits merely by calling the banishment-like burdens a civil remedial scheme rather than a punitive one.

5. Nor does the *Ex Post Facto* Clause allow Florida to pile new punishments on top of old ones for long-past offenses. Many registrants committed their underlying offenses before the State adopted the full set of burdens they now bear. Yet Florida and its counties and municipalities apply those later-enacted restrictions to them anyway, imposing new disabilities years or decades after the offense conduct occurred and the punishments imposed by the sentencing court were served. That is just what the *Ex Post Facto* Clause forbids: A legislature may not change the punishments for past conduct by attaching new punitive burdens after the fact.

6. Florida's sex-offender registration scheme also unconstitutionally burdens the fundamental right to interstate travel. Registrants may not freely leave Florida for ordinary out-of-State trips without 48-hour, in-person reporting to law enforcement for domestic travel and 21-day, in-person reporting for international travel. Without such notice, simple vacations are made felonies. And travel on short notice—say, for a loved one's funeral or an impromptu holiday—is flatly unlawful if reporting offices are closed, as typically they are over weekends and often during the week. But "the constitutional right to travel from one State to another" is a basic incident of national citizenship and is "a virtually unconditional personal right, guaranteed by the Constitution to us all." *Saenz v. Roe*, 526 U.S. 489, 498 (1999). "[A] penalty on the exercise of the right to travel violate[s] the Equal Protection Clause unless shown to be

necessary to promote a compelling governmental interest." *Id.* at 499. Florida's registration scheme doesn't come close.

7. The loitering provision of Florida's sex-offender registration scheme—which operates effectively as a presence ban—is constitutionally invalid both because it outlaws innocent presence and is void for vagueness. *See* Fla. Stat. § 856.022(3). Florida prohibits registrants from "loitering" within 500 feet of "places where children [are] congregating." But procedural safeguards designed to prevent arbitrary enforcement under Florida's general loitering statute do not apply to the sex-offender loitering law, which applies without regard to innocent intent. What's more, there is no way to determine what constitutes "loitering," let alone loitering near a "place[] where children [are] congregating." The law—and similar ordinances adopted by Florida's counties and municipalities—fails to give notice where registrants may stand, wait, walk, sit, or pass through. And they do not confine the discretion of police officers who enforce the law. The Constitution forbids a State to condition felony liability on guesswork and caprice.

8. Finally, the Florida scheme forbids a registrant even from simply *speaking* with someone under the age of 18 in a park or near a playground or swimming pool. *See* Fla. Stat. § 856.022(4)(a); *see also* Columbia County Code § 74-83; Hendry County Code § 1-14.7-59(b); Suwannee County Code § 60-3(b). These laws contain no harm element or illicit intent element; they

are straightforward gag laws that ban a registrant from engaging in any kind of expression—including political and religious speech and expressive activities like protests and marches—in public forums traditionally reserved for precisely such communication.

9. Other county and municipal ordinances forbid registrants from approaching children in a park or playground with intent to "communicat[e]" about anything "of a sexual nature." *See, e.g.*, Lee County Code § 19-53; Fort Myers Code § 50-143; Broward County Code § 21-167B; Martin County Code § 111.157; Miami-Dade County Code § 21-185. These too are outright gag laws. Apart from inherent vagueness, they effectively ban a registrant from participating in core political speech related to abortion rights, LGBTQIA+ rights, bodily autonomy, sex education, the rights of sex workers—or even the wisdom or constitutionality of sex-offense registration schemes.

10. Yet other county and municipal ordinances forbid registrants from engaging in holiday-related expressive activities. *See, e.g.*, Jacksonville Ordinance Code § 685.104; Clay County Code § 15-47; Hernando County Code § 21-238; Pasco County Code § 66-70; Putnam County Code § 28-3(i). Participation in public holidays, including by decorating one's home, is a core exercise of freedom of expression and free exercise of religion.

11. Speaker-based and content-based speech bans like these are presumptively unconstitutional and must be narrowly tailored to achieve a com-

pelling governmental interest. It is extraordinarily rare for laws like these to survive strict scrutiny, and the laws here do not do so.

12. This case is therefore about constitutional limits at their most basic. Once a person has served a punishment lawfully imposed by a sentencing judge for an offense proved beyond a reasonable doubt, the State may not continue to exact ever-expanding penalties wrapped in a veneer of civil regulation. It may not banish, retroactively punish, burden the interstate movement of, criminalize by indeterminate command, or gag the speech of past offenders—at least not without satisfying the Constitution's exacting demands for doing so, which Florida's sex-offender registration scheme does not.

13. A public witness speaking recently in support of Florida's latest expansion of penalties for sex offenders, House Bill 45, rightly described Florida's scheme as tantamount "to post[ing] a big 'Unwelcome!' sign at the state border of Florida and say[ing] 'Sex offenders, you're not welcome here! Go to another State! You don't have any rights!'" Nov. 5, 2025 House Crim. J. Subcom. (40:29–40) (testimony of Barney Bishop). The same witness concluded: "We shouldn't be doing a single, solitary thing to help them find a place to live in Tallahassee or in the State of Florida. They should be out of the State. So please support this good bill." *Id.* at 40:57–41:10.

14. That witness was correct about the law's effect, but he assuredly was wrong that registrants have no rights. These individuals have served their

sentences and paid their debts to society. They are entitled to make genuine efforts at rehabilitation and reintegration. Lifelong expulsion from the community and overbearing, parole-like government supervision is not the way.

15. The Court accordingly should declare that:

**(i)** Florida's sex-offender registration scheme is a punitive measure and not a civil remedial one;

**(ii)** Florida's sex-offender residency and presence restrictions, and all similar or related county and municipal ordinances, violate the Eighth Amendment's ban on cruel and unusual punishments;

**(iii)** under the *Ex Post Facto* Clause, restrictions added to the scheme may not apply to registrants whose offense conduct pre-dates the change;

**(iv)** the travel restrictions of Section 943.0435(7) and (8) violate the Equal Protection Clause and its protection of the right to interstate travel;

**(v)** the scheme's loitering provisions, Section 856.022(3), and all similar or related county and municipal ordinances, are invalid because the provisions forbid innocent presence and are void for vagueness; and

**(vi)** the public park gag provision, Section 856.022(4)(a), and all similar or related county and municipal ordinances, are unconstitutional content-based and speaker-based bans on expression.

16. The Court then should enjoin the defendants from enforcing any of the foregoing laws against the Florida Action Committee's members.

## JURISDICTION AND VENUE

17. Plaintiff's cause of action is authorized by 42 U.S.C. § 1983, the Declaratory Judgment Act (28 U.S.C. §§ 2201–02), the Supremacy Clause of the U.S. Constitution, and the Court's inherent equitable powers.

18. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because at least one defendant resides in this District and all defendants are residents of the State of Florida.

## PLAINTIFF AND STANDING

20. Plaintiff the Florida Action Committee, Inc. (FAC) is a non-profit advocacy organization. Its mission is educating the media, public, and elected officials concerning the counter-productive effects of Florida's sex offender registry and the unfair and unlawful harm it inflicts on registrants and their families. FAC seeks proven, effective measures to prevent harm to victims of crime without compromising the Constitution or public safety. It often participates in litigation to advance the interests of its members and to promote the adoption of a lawful and empirically informed registration scheme. This lawsuit is germane to its institutional mission.

21. FAC has thousands of members living all across the State of Florida, including in each of the counties, cities, and towns sued in this case. Its

members have suffered and will continue to suffer ongoing, concrete injuries as a result of the challenged statutory and regulatory scheme, including restrictions on residence, movement, employment, and daily life.

22. The declarations of more than 250 FAC members are attached as Exhibit 5. The declarations detail the injuries to each member within the jurisdiction of each defendant as relevant to each claim and as necessary to establish injury-in-fact. They are incorporated as though fully set forth herein.

23. Many of FAC's members have been newly subjected to Florida's registration scheme within four years of the filing date of this complaint. *See* Exhibit 5.

24. Others have been subject to Florida's registration requirements for longer than four years and have suffered continual, repeated, and ongoing constitutional violations every time officers knock on their doors to confirm their registered residence; every time they must avoid populated areas because of Florida's sex-offender presence restrictions; every time they move residences and are subjected anew to the registration scheme's residency restrictions or decline to move when otherwise they would have moved because of those restrictions; every time they must take time out of their days, often missing work, to appear at the sheriff's office to make new in-person reports; every time they forego in-state travel that would entail establishing a "temporary" residence for three days or longer; every time they avoid or miss interstate or

international travel due to the scheme's reporting and notice obligations; and every time Florida's legislative bodies amend the relevant provisions with additional burdens. *See* Exhibit 5.

25. At least one FAC member injured as described in the preceding paragraphs lives within the territorial limits of each County or Municipal Defendant or would choose to live there were it not for the statutes and ordinances challenged in this lawsuit, as indicated in their declarations. *See* Exhibit 5. Many FAC members also frequently do visit, or would visit, friends or family or public areas within the territorial limits of other defendants. *See id.*

26. The declaration of FAC's president is attached as Exhibit 1 to this complaint and is incorporated as though fully set forth herein.

27. All other exhibits and other cited documents are incorporated by reference as though fully set forth herein.

**DEFENDANTS**

28. Defendant Mark Glass is the Commissioner of the FDLE and is responsible for enforcement of Florida's state-level sex-offender registration laws. He is sued in his official capacity only.

29. The "County & Municipal Defendants" are the counties of Brevard, Broward, Calhoun, Citrus, Clay, Columbia, Flagler, Hendry, Hernando, Holmes, Indian River, Jackson, Lake, Lee, Levy, Marion, Martin, Miami-Dade, Okeechobee, Osceola, Palm Beach, Pasco, Polk, Putnam, Seminole, St.

Johns, St. Lucie, Sumter, Suwannee, Union, Volusia, and Washington; and the cities of Boca Raton, Cape Coral, Coral Springs, Davie, Fort Lauderdale, Fort Myers, Gainesville, Hollywood, Jacksonville, Miramar, Orlando, Pembroke Pines, Pompano Beach, Sunrise, and West Palm Beach. Each is a governmental sub-unit of the State of Florida.

30. Each county defendant exercises the power of "self-government," whether chartered or non-chartered. *See* Fla. Const. Art. VIII § 1(f), (g). Each County or Municipal Defendant exercises "home rule powers granted by the constitution" of the State of Florida. *See* Fla. Stat. § 166.021. These "residual constitutional home rule powers" are memorialized in and "conferred on municipalities by the" Municipal Home Rule Powers Act. *Id.* § 166.042.

31. We refer to the following County & Municipal Defendants as the "Residency Restriction Defendants": The counties of Brevard, Broward, Calhoun, Citrus, Clay, Columbia, Flagler, Hendry, Hernando, Holmes, Indian River, Jackson, Lake, Levy, Marion, Martin, Miami-Dade, Okeechobee, Osceola, Palm Beach, Pasco, Polk, Putnam, Seminole, St. Lucie, Sumter, Suwannee, Union, Volusia, and Washington; and the cities of Boca Raton, Cape Coral, Coral Springs, Davie, Fort Lauderdale, Gainesville, Hollywood, Jacksonville, Miramar, Orlando, Pembroke Pines, Pompano Beach, Sunrise, and West Palm Beach. Each of these defendants has adopted an ordinance forbidding registrants from living (permanently or temporarily) within defined

exclusion zones. These ordinances, which we call the Residency Restriction Ordinances, are identified in Exhibit 2.

32. We refer to the following County & Municipal Defendants as the "Presence Restriction Defendants": The counties of Brevard, Broward, Calhoun, Clay, Columbia, Flagler, Hendry, Hernando, Lake, Lee, Levy, Martin, Miami-Dade, Okeechobee, Pasco, Putnam, Seminole, St. Johns, Suwannee, and Union; and the cities of Fort Myers, Jacksonville, and West Palm Beach. Each of these defendants has adopted an ordinance generally forbidding the presence of registrants within defined exclusion zones. These ordinances, which we call the Presence Restriction Ordinances, are identified in Exhibit 2.

33. We refer to the following County & Municipal Defendants as the "Vague Ordinance Defendants": The counties of Brevard, Broward, Calhoun, Citrus, Clay, Columbia, Hendry, Hernando, Holmes, Jackson, Lake, Lee, Levy, Marion, Martin, Miami-Dade, Osceola, Palm Beach, Pasco, Putnam, St. Johns, Sumter, Suwannee, Union, and Washington; and the cities of Coral Springs, Davie, Fort Myers, Hollywood, Jacksonville, Pembroke Pines, and West Palm Beach. Each of these defendants has adopted an ordinance using vague terms such as "loiter," or "congregate," or "vicinity." These ordinances, which we call the Vague Ordinances, are identified in Exhibit 2.

34. We refer to the following County & Municipal Defendants as the "Gag Ordinance Defendants": The counties of Broward, Clay, Columbia,

Hendry, Hernando, Lee, Martin, Miami-Dade, Pasco, Putnam, and Suwannee; and the cities of Fort Myers and Jacksonville. Each of these defendants has adopted an ordinance imposing speaker-based or content-based restrictions on speech and expression. These ordinances, which we call the Gag Ordinances, are identified in Exhibit 2.

## FACTUAL ALLEGATIONS

### A. Florida's sex-offender registration scheme

35. "States in the early 1990's began enacting registry and community-notification laws to monitor the whereabouts of individuals previously convicted of sex crimes." *Nichols v. United States*, 578 U.S. 104, 105–06 (2016). In 1994, Congress enacted the Jacob Wetterling Act, which "conditioned federal funds on States' enacting sex-offender registry laws meeting certain minimum standards." *Id.* at 106. "In 2006, Congress replaced the Wetterling Act with the Sex Offender Registration and Notification Act (SORNA)." *Id.*; *see also* Pub. L. 109-248, 120 Stat. 587 (2006).

36. Pertinent here are the requirements applicable to registrants previously convicted of violating Florida Statutes Sections 794.011, 800.04, 827.071, 847.0135(5), or 847.0145, or similar offenses in another jurisdiction. As one commentator recently explained, "[s]ex registries don't operate the way many people believe. They are not limited to people convicted of the most serious sexual offenses; instead, the lists sweep in a much broader range

of offenses, including ones that took place decades ago; that did not involve any contact with children; consensual relationships between teens and adults just over the legal threshold; and other less egregious [or] nonviolent charges such as public urination." Hanna L. Dershowitz, *Florida's new sex offender registrant restrictions will not improve public safety*, Reason Foundation (March 30, 2026), https://perma.cc/7KX4-DG6S.

37. Section 794.011 prohibits sexual battery. The State previously has charged violations of this provision in connection with consensual sex between a 17-year-old and 16-year-old who were in a "long-term dating relationship." *See Acevedo v. Williams*, 985 So. 2d 669, 669 (Fla. 1st DCA 2008) (overturning conviction).

38. Section 800.04 prohibits lewd or lascivious conduct, including sexual activity with another person between the ages of 12 and 16. It applies regardless of the offender's age, the victim's willingness, or the offender's bona fide belief that the victim was older than 16. The State often charges young people with violations of Section 800.04, notwithstanding mutual consent. In one example, Julius Samuels was convicted under Section 800.04 for having consensual sexual relations with his 14-year-old girlfriend when he was 18 years old. *See State v. Samuels*, 76 So. 3d 1109, 1110 (Fla. 5th DCA 2011). In *Wromas v. State*, "[t]he charged offense was eighteen-year-old Wromas' consensual sexual relations with his fifteen-year-old girlfriend." 208 So. 3d 218,

219 (Fla. 3d DCA 2016). Other examples are many. *See, e.g.*, *State v. Marcel*, 67 So. 3d 1223, 1225 (Fla. 3d DCA 2011) (similar); *Courson v. State*, 24 So. 3d 1249 (Fla. 1st DCA 2009) (similar); *State v. Sorakrai*, 543 So. 2d 294 (Fla. 2d DCA 1989) (similar).

39. Section 827.071 prohibits knowing possession or viewing of depictions of minors engaged in sexual conduct.

40. Section 847.0135(5) prohibits any sexual act "that does not involve actual physical or sexual contact" and is transmitted "live" over the internet for viewing by a minor. In effect, it prohibits underage "phone sex" using live video. Like Section 800.04, it applies regardless of the age of the offender or consent of the victim.

41. Section 847.0145 prohibits a parent, legal guardian, or other person having custody or control of a minor from prostituting the minor.

### *1. General registration requirements*

42. Florida first adopted its basic reporting and notification scheme, codified at Section 943.0435, in 1997. The following year, the legislature expanded the qualifying offenses and added to the information that registrants are required to report.

43. In 2000, the Florida legislature again increased the information that must be reported and required county and local law enforcement agencies to verify the addresses of sexual offenders in person, as required to obtain

federal funding under the Wetterling Act. It also imposed registration requirements for life. In 2002 and 2004, the legislature further expanded the qualifying offenses and the information that registrants must provide. Also in 2004, the legislature adopted statewide sex offender residency restrictions. In 2005, the legislature imposed semi-annual, in-person reporting requirements. In 2007, it added new qualifying offenses, required yet more data (email addresses and instant message names), and imposed quarterly reporting requirements for certain registrants.

44. From 2009 through 2018, the legislature amended the scheme seven more times, adding new qualifying offenses, expanding the personal information that registrants must report, and limiting the circumstances under which a court may grant a petition for removal from the registry.

45. In 2024, the District Court for the Northern District of Florida ruled that Florida's requirement that registrants report in person to both the local sheriff's office and the Department of Highway Safety and Motor Vehicles for temporary address changes that do not require a replacement driver's license was so irrational as to violate due process. *See* Order on the Merits, *Harper v. Glass*, No. 4:21-cv-85 (N.D. Fla. Mar. 25, 2024), ECF No. 129.

46. Most recently the legislature adopted and Governor DeSantis signed HB 45, adding public pools to the list of property features near which registrants are not permitted to live.

47. Under Florida's sex offender registration scheme, individuals convicted of qualifying sex offenses must register as sex offenders for the rest of their lives. *See* Fla. Stat. § 943.0435(1)(h), (11)(b).

48. Upon initial registration, registrants must provide the State with identifying data, including basic demographic and biographic information, descriptions of "tattoos or other identifying marks," fingerprints, employment information, permanent and temporary addresses, a complete description and tag number of all vehicles owned, home telephone numbers, mobile telephone numbers, email addresses, and all internet profile information for all websites. *Id.* § 943.0435(2)(b), (3); *accord id.* § 944.607. Some sheriff's offices require mug shots and treat the process the same as being booked into jail.

49. If there are any subsequent changes to employment, telephone number, email address, or internet identifiers, registrants must report those changes online within 48 hours. *Id.* § 943.0435(4)(e). A change in residential address or vehicle registration had to be reported *in person* within 48 hours (*id.* § 943.0435(2)(b)(3), (4)(b)), but *Harper* struck down the in-person requirement. Now changes may be reported online.

50. Registrants must still report to the local sheriff's office, in person, two or four times per year, depending on the offense. *Id.* § 943.0435(14). If they are homeless, they must do so monthly. *Id.* § 943.0435(4)(b)(2). Each time a registrant reports for re-registration, he must go through the same

process as though it were his first time registering. It can take several hours to complete, entails filling out and signing scores of different documents, and often requires a registrant to take an entire day off of work.

51. Pursuant to Section 322.141(3)(a), "a person designated as a sexual predator under § 775.21 or who has a similar designation under the laws of another jurisdiction" and who obtains a Florida driver's license will forever and without exception have his license stamped with a prominent marking: SEXUAL PREDATOR. The following graphic is used by the Department of Law Enforcement as an example (https://perma.cc/3996-KNT7):




52. Registrants who are not denominated sexual predators bear the following warning on their State IDs instead: "943.0435."

53. A registrant who plans to travel out-of-State for three days or longer must report the details of his travel plans *in person* 48 hours before leaving. Fla. Stat. § 943.0435(7). If a registrant plans to travel internationally for five or more days, he must report such plans in person 21 days before leaving. *Id.*

The statute allows for untimely notice in the event that the travel plans are "not known" to the registrant within the statutory notice period. *Id.* But the in-person reporting requirement is not waivable, and registrants must provide an address where they will be staying while traveling.

54. Registration offices are typically closed over weekends, and it is not unusual for closures of three or four days at a time. The Highlands County Sheriff's Office is open for registration on Tuesdays only. The Baker, Charlotte, Columbia, Glades, Lafayette, Liberty, and Manatee County Sheriff's Offices are open for registration just two days per week. The Jackson, Leon, Putnam, Sarasota, and Suwannee County Sheriff's Offices are open only three days per week. The remaining sheriff's offices are generally open only on weekdays, excluding holidays. *See* FDLE, *Registration Locations*, https://-perma.cc/M2JB-ZL9Y. It is thus sometimes impossible to comply with the 48-hour notice requirement, rendering interstate travel flatly unlawful.

55. Failure to comply with any of the foregoing reporting and registration requirements is a felony. *See* Fla. Stat. § 943.0435(9).

***2. Residency restrictions***

56. Florida's sex-offender registration scheme further restricts where registrants are permitted to live. Pursuant to Section 775.215, registrants previously convicted of violating Section 794.011, 800.04, 827.071, 847.0135(5), or 847.0145, or any analogous statute of another State, involv-

ing a victim under 16 years of age, are prohibited from residing within 1,000 feet of any school, child care facility, park, or playground. *Id.* § 775.215(2)(a). It does not make a difference whether the school, child care facility, park, or playground is public or private. *Id.* § 775.215(1).

57. Following passage of HB 45 in March 2026, registrants as of July 1 also may not live within 1,000 feet of a public pool, including pools operated by residential "subdivisions, apartments, condominiums, mobile home parks, or townhouses." Registrants living in noncompliant housing before July 1 may remain there, but all registrants newly released or who move after July 1 to new housing must comply. This new pool restriction is substantial, as "Florida has more pools than any other State in the Nation." March 11, 2026, House Debate (4:01:32–37) (Rep. Gottleib).

58. A "residence" is defined by Section 775.21 to include a permanent, temporary, or transient residence. It includes any and every location where the registrant abides or lodges for three days or more in aggregate during a calendar year. It includes any place where a registrant sleeps or seeks shelter, including places lacking physical addresses.

59. The residency restriction thus bars not only traditional permanent residences, but any and every place a person may visit on three separate occasions for overnight stays in a single calendar year—places like the homes

of friends or family members, favored hotels near vacation destinations, and even campgrounds.

60. The statewide residency restriction alone renders between 57% and 60% of all residential housing units in Florida legally unavailable to registrants, depending on how authorities measure distances. *See* Exhibit 3 (Decl. of Dr. Kelly Socia) at 3, 13. Within these areas, registrants cannot so much as take a four-day vacation.

61. Financial constraints facing most registrants, and general rental availability rates, substantially diminish the availability of permanent housing. *Id.* at 18. With these considerations, an individual newly subject to the statewide residency restriction alone (Section 775.215) will be denied access to nearly 98.9% of residential housing units in the State. *Id.* at 18–19.

62. The picture is bleaker in densely populated counties. For instance, the statewide residency restriction by itself, with no other legal or practical considerations, blocks around 92% of residential housing units in Broward County and around 73% of residential housing units in both Miami-Dade County and Palm Beach County. *Id.* at 4, 19–20, 24, 28.

63. More than 140 Florida cities and counties have passed local ordinances that further restrict where registrants may live. A substantial majority of these ordinances extend the distance from 1,000 feet to 2,500 feet (extending the exclusion zones from 72 acres to 451 acres). Many also prohibit an

offender from living within 2,500 feet of additional land features and buildings, including libraries, churches, and bus stops.

64. Among these Residency Restriction Ordinances, for example:

a. Miami-Dade County Code § 21-281 enlarges the residency exclusion zones within the county to 2,500-foot distances from schools. Ordinance 10-01 made this extension applicable in all 35 municipalities within the county and preempted and repealed all other municipal sex-offender registration ordinances.

b. Broward County Code of Ordinances § 21-167A enlarges the residency exclusion zones within the county to 2,500-foot distances from any school, public school bus stop, day care center, park, or playground.

c. Palm Beach County Code of Ordinances § 18-34 initially established a 2,500-foot exclusion zone, but Ordinance 2014-020 reverted to 1,000-foot zones. Palm Beach County now prohibits permanent or temporary residency within 1,000 feet "of any school, day care center, park, playground, or other place where children regularly congregate," expanding the number of disqualifying features with vague language.

d. Jacksonville's ordinance is unclear. It initially adopted a 2,500-foot residency restriction from "any school, public library, day care center, park, playground, or other place where children regularly congregate." *See* Jacksonville Code of Ordinances § 685.102. It later adopted Ordinance

2017-667, ostensibly reducing the restriction to 1,500 feet. But the Code remains unaltered, leaving its status uncertain.

e. Brevard County retains a 1,000-foot exclusion zone from "any school, day care center, park or playground" but recently permitted businesses to self-designate as "parks" for purposes of the ordinance. *See* Brevard County Code of Ordinances §§ 74-102(a), 74-102.5. To date, at least 39 businesses have done so, including an art gallery and clothing store. *See* https://sites.brevardfl.gov/BSR/#/Search.

f. Hernando County also retains a 1,000-foot exclusion zone but applies it to a far wider range of disqualifying features, including "any school, child care facility, park, playground, public library, long term care facility, nursing home facility, or religious institution." Hernando County Code of Ordinances § 21-232.

65. A complete list of all of the challenged county and municipal Residency Restriction Ordinances appears in Exhibit 2.

66. As a result of these additional Residency Restriction Ordinances, a significant majority of housing in many major urban areas is legally off limits to registrants. For instance, 99% of residential housing units in Broward County are legally unavailable to registrants. Exhibit 3 at 4, 24. The figures are 93% in Miami-Dade County, 81% in Jacksonville (Duval County), and 73% in Palm Beach County. *Id.* at 4, 20, 28–29.

### *3. Presence restrictions*

67. In addition to these extensive residency restrictions, registrants in Florida are prohibited by state law and various county and municipal ordinances from being present in most public locations, including parks and recreational areas, during the day.

68. Section 856.022(3) imposes criminal liability on registrants for "loitering and prowling . . . within 500 feet of a place where children [are] congregating." Prior to enactment of HB 45, the limit was 300 feet. The prohibition applies to registrants who have committed violations listed in Section 856.022(1), which is inclusive of but broader than the list of offenses appearing at Section 775.215(2)(a).

69. The statute does not define "loitering and prowling," nor do most county and municipal ordinances that use the same words. The dictionary defines "loiter" to mean "to remain in or near a place in an idle or apparently idle manner" or "hang around aimlessly." *Websters Third New International Dictionary* 1331 (2002) (hereinafter *Websters*). It defines "prowl" to mean "roam in search or as if in search of whatever may be found" or to "pace restlessly back and forth." *Id.* at 1828. Both definitions leave unanswered what it is to be idle, or restless, or "as if in search of" something.

70. The statute also does not define "children" or "congregating." Again, nor do many county and municipal ordinances that use these and

similarly vague terms. *See, e.g.*, Brevard County Code § 74-102(b) ("in the vicinity of children"); Hernando County Code § 21-239 (same). The dictionary defines a "child" generally as "a young person" or even just "a son or daughter" (*Websters* at 388), leaving it unclear whether the people congregating must all be minors, or simply people who are or appear to be relatively young, or simply those who have living parents. Elsewhere, the Florida statutes use more concrete standards, even in the next paragraph of Section 856.022, which refers to "a child under 18 years of age." Fla. Stat. § 856.022(4)(a); *see also id.* § 1014.02(1) (referring to "minor children" and "a minor child"). The sex-offender loitering statute includes no such modifiers.

71. The dictionary defines "congregate" to mean "to come together, collect, or concentrate in a particular locality or group." *Websters* at 478. And the dictionary defines "vicinity" as "a surrounding area or district." *Id.* at 2550. The definitions of these words (and their common usages) leave unanswered how many people must gather, in what density, or over how large an area.

72. The meanings of all of these terms are elastic, and their applications vary with subjective opinions and judgments. *See City of Chicago v. Morales*, 527 U.S. 41, 59 (1999). The "definition of the forbidden conduct [is not] clear," and the "ordinance fails to give the ordinary citizen adequate notice of what is forbidden and what is permitted." *Id.* at 60.

73. Florida Statutes Section 856.022(3) does not allow a registrant accused of loitering to explain or justify his presence. Nor does it require that the registrant's presence be threatening or alarming. It includes no additional elements or requirement of criminal intent.

74. When asked to produce records identifying the locations that constitute "places where children were congregating" within the meaning of Section 856.022(3), three county sheriff's offices expressly stated that it was a case-by-case determination made in the field, according to the officer's discretion. *See* Exhibit 4, at ¶ 12. Most offices simply stated that no such records exist. *Id.* ¶ 11.

75. Section 856.022(3) functions, in practice, as a presence restriction. Assuming that "places where children were congregating" are likely to include common features—schools, parks, shopping centers, drive-ins and open stadiums, enclosed theaters and auditoriums, bowling alleys, skating rinks, tourist attractions, cultural facilities, outdoor recreational facilities, daycares, and public pools—entire cities become off limits to simple presence.

76. County and municipal Presence Restriction Ordinances also are common, compounding the effect of Section 856.022(3). For example, in addition to enlarging their residency restrictions to 2,500 feet from "any school, daycare center, park, playground, school bus stop or other place where children regularly congregate," Union County (Ordinance 2025-04) and Calhoun

County (Ordinance 2008-01) both forbid a registrant even to "travel through" such exclusion zones, let alone live in them. Brevard, Hernando, and Seminole Counties maintain similar no-traveling-through ordinances, limited to 1,000-foot exclusion zones. Brevard County recently clarified in Ordinance 2024-07 that registrants may not conduct paid or volunteer work within these exclusion zones.

77. Cities and towns across the State have adopted similar rules. Fort Myers, for instance, bars a registrant "from being on or within" certain "specified locations," including all "stationary" or "business" facilities in the county, and all beaches and public parks "when children are present." Fort Myers Code of Ordinances § 50-141(a).

78. More than a dozen other counties or municipalities maintain 300-foot presence-forbidden zones. The Presence Restriction Ordinances are identified in Exhibit 2.

79. Related, Section 856.022(4)(a), as amended by HB 45, makes it unlawful for a registrant to "contact, communicate with, or approach with the intent to contact or communicate with a child under 18 years of age in any park building or on real property comprising any park, playground, or public swimming pool" unless the child is an immediate family member or household member. This speaking ban does not depend on the nature of the communication or include a harm element or illicit intent element. It simply forbids

speaking to anyone under 18 in a public or private park or playground and at a public swimming pool. Similarly, Columbia, Hendry, and Suwannee Counties all forbid a registrant from "communicat[ing] in any manner with any child who is not their own child, stepchild or grandchild at any designated public school bus stop." *See* Columbia County Code § 74-83; Hendry County Code § 1-14.7-59(b); Suwannee County Code § 60-3(b). By these standards, registrants are effectively gagged if a minor is present at such locations—no matter if their message is political, religious, or otherwise.

80. Related, a number of county and municipal ordinances make it unlawful for a registrant to approach children in a park or playground with intent to "communicat[e]" about anything "of a sexual nature." *E.g.*, Lee County Code § 19-53; Fort Myers Code § 50-143; Broward County Code § 21-167B; Martin County Code § 111.157; Miami-Dade County Code § 21-185. These too are gag laws. They do not define content "of a sexual nature," which may be interpreted to forbid a wide range of protected political speech relating (for example) to abortion rights, LGBTQIA+ rights, bodily autonomy, sex education, the rights of sex workers—or even the wisdom or constitutionality of sex-offense registration schemes.

81. Other county and municipal ordinances make unlawful Halloween or other holiday-related expressive activities. *See* Jacksonville Ordinance Code § 685.104; Clay County Code § 15-47; Hernando County Code § 21-

238; Pasco County Code § 66-70; Putnam County Code § 28-3(i). It is a "basic rule" that "a street or a park is a quintessential forum for the exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 796 (1989)). And it is a "fundamental principle of the First Amendment" that "*all* persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Id.* (emphasis added). Governmental efforts to silence registrants in parks and near playgrounds and pools are subject to the limits of the First Amendment, like any other regulation of speech. *Id.*

82. These laws ban protected speech, plain and simple. Because registrants cannot know the age of every listener they encounter, and because—in the case of the content-based ordinances—they cannot know when a police officer will deem their speech as bearing a "sexual nature" or being holiday-"related," these laws also cast a chill that, in practice, bars registrants from speaking on any topic, with almost anyone, in many public forums. *E.g.*, Exhibit 5 at 2–3, 7–8, 11–12.

83. Combined residency and presence restrictions prevent registrants from living in or near town centers and other densely populated areas and even from entering or remaining in such places during the day. Registrants are effectively prohibited from being present in numerous public locations, includ-

ing parks and recreational areas like beaches, shopping malls, sporting facilities, cultural facilities, and so forth.

**B. Practical effects of the scheme on registrants**

84. Registrants are frequently unable to secure lawful housing in the same towns or counties where their families live. Many are forced to relocate repeatedly due to changes in applicable restrictions. Others are rendered homeless or transient as a direct result of Florida's and its counties' and municipalities' residency restrictions.

85. Many registrants cannot return to their longtime homes after being released from prison. *E.g.*, Exhibit 5 at 6–7. Husbands and wives, parents and children are effectively separated by the law, making even short visits with family unlawful. *E.g.*, *id.* at 1–2, 3–5, 7, 8, 12, 30, 39. Registrants are also prevented from practicing their religions because they are effectively barred from attending church services. *See id.* at 37–38.

86. Registrants and their families describe the search to find compliant residences as an extremely difficult task. *Id.* at 1–2, 3–5, 7, 8, 12, 30, 39. Officers advised one FAC member, who could not return home upon release, to "get a tent and head for the woods" because finding stable, compliant housing would be impossible. *See* Appendix at 71–72, *Clements v. Secretary, Department of Corrections*, No. 2:24-cv-294 (M.D. Fla. Jan. 5, 2026), ECF No. 31-1 (hereinafter *Clements Appendix*).

87. Such advice is not hyperbole. Approximately 7% of registered sexual offenders living in Florida communities are homeless or transient. Florida Office of Program Policy Analysis and Government Accountability, *Sex Offender Registration and Monitoring Triennial Review—2024*, at i, 12 (Dec. 2024), https://perma.cc/RU6M-VFPC (hereinafter *Triennial Review*). That number rises as high as 34% in more populous counties like Miami-Dade and Broward. *Id*. FAC's own records indicate that more than 20% of its membership have been homeless for at least some period of time, despite having friends or family with whom they could have stayed were it not for the sex-offender registration scheme's residency restrictions. *See* Exhibit 6.

88. Because nearly all of south Florida is restricted, "roving encampments" of sex offenders have set up "tents and makeshift shacks" in a few nonrestricted parking lots or slivers of public land in Miami-Dade County. *See* Exhibit 7 (Beth Schwartzapfel & Emily Kassie, *Banished*, Marshall Project (Oct. 3, 2018)).

89. Homelessness subjects registrants to additional restrictions. Some county ordinances authorize police officers to arrest sex offenders camping on public lands (*id.*), and offenders who do not have permanent addresses are subject to substantially more frequent reporting requirements. *See* Fla. Stat. § 943.0435(b); *see also id.* § 125.0231 (regulating public camping).

90. Police informed one FAC member, who was convicted more than a decade prior, that he had 14 days to move out of the once-compliant apartment where he had lived for several years because a new park had been established in his neighborhood. Officers ejected the same individual from his next residence because a new city ordinance changed the restricted area around a nearby school. *Clements Appendix* at 68.

91. For individuals who have been permitted by a grandfathering provision to remain in the longstanding homes in which they have lived since before Florida adopted its sex offense registration scheme, the restrictions are no less burdensome when they look to relocate or travel. *See, e.g.*, Exhibit 5 at 7–8, 35–36. The burden is particularly acute for registrants who have lived peacefully and without event in Florida for decades, and who simply wish to move to senior living facilities, as there are no exceptions for people who require assistance due to age or disability. *See, e.g.*, *id.* at 35–36. Elderly registrants typically must be sent to remote areas, far from family and the resources they need.

92. Those who may need to stay at in-patient hospital wards are placed in impossible positions if the hospital is in an exclusion zone. One FAC member reports that, after returning home from overseas military service where he survived combat, including three ordnance explosions, he now obtains treatment at the nearby Veterans Affairs facility. The facility has a residential

rehabilitation program for which he qualifies, but which is now off-limits because of residency restrictions. *Id.* at 9–10.

93. Residency and travel restrictions also hinder registrants' ability to work. *See, e.g.*, *id.* at 49–50. They often are forced to find housing in rural areas, which are isolated from jobs and reliable transportation. And when they become homeless (as often they do), finding stable work becomes nearly impossible. *Clements Appendix* at 69–70. One FAC member who owns a landscape company lost the pesticide spraying license he had held for eight years when the State of Florida determined that registrants could no longer have it. Exhibit 5 at 28.

94. Florida typically requires reporting within 48 hours of the associated triggering event, such as taking an interstate vacation. But registration locations often are closed for periods longer than 48 hours at a time. The Highlands County Sheriff's Office is open for registration on Tuesdays only. The Baker, Charlotte, Columbia, Glades, Lafayette, Liberty, and Manatee County Sheriff's Offices are open for registration just two days per week. The Jackson, Leon, Putnam, Sarasota, and Suwannee County Sheriff's Offices are open only three days per week. The rest are generally open on weekdays only, excepting holidays. *See* FDLE, *Registration Locations*, https://perma.cc/M2JB-ZL9Y. This lack of operating hours means, for example, that if an opportunity for interstate travel arises on short notice, there is no way to comply, and the

travel becomes categorically illegal. This has happened to FAC members repeatedly. *See, e.g.*, Exhibit 5 at 49–50; *Clements Appendix* at 85–86.

95. Registrants who make sustained and good-faith efforts to comply with all registration requirements, including in-person reporting obligations, residency verifications, and travel notifications still are frequently unable to secure stable and lawful housing within any major population center due to Florida's residency restrictions and overlapping local ordinances. Moreover, registrants must avoid parks, recreational facilities, and other locations deemed places where children may be present, even where those locations are integral to daily life and participation in the community. They must do so for the rest of their lives, no matter how long ago they offended or how rehabilitated they now are. *E.g.*, Exhibit 5 at 7–8, 13–14, 32–33.

96. The boundaries of prohibited areas are not clearly defined and are difficult for registrants to ascertain. Registrants often avoid entering populated areas, including commercial districts, public facilities, and civic spaces, even when those areas are otherwise open to the general public. The restriction on presence prevents registrants from engaging in ordinary activities such as accessing recreational resources. *See* Exhibit 5.

**C. Interagency coordination to enforce the scheme**

97. The County & Municipal Defendants are governmental subunits of the State of Florida that are "unequivocally included within the definition of

'state agencies or subdivisions'" for purposes of state tort law and sovereign immunity. *Commercial Carrier Corp. v. Indian River County*, 371 So. 2d 1010, 1016 (Fla. 1979) (quoting Fla. Stat. § 768.28).

98. A Florida "law enforcement officer" includes any officer of "any municipality or the state or any political subdivision thereof" who is "vested with authority to bear arms and make arrests." Fla. Stat. § 943.10(1).

99. A "local government" is subject to suit under Section 1983 when a "policy or custom" of the local government entity is the "moving force" behind a constitutional violation. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). Each ordinance challenged in this case reflects a "policy or custom" of the County or Municipal Defendant that adopted it, within the meaning of the *Monell* doctrine.

100. An action taken to adopt or enforce a municipal ordinance and an action taken to adopt or enforce a state statute are both exercises of state authority, taken under "color of law" within the meaning of Section 1983.

101. A registrant living or present within the jurisdiction of a County or Municipal Defendant must comply with both Florida state law and all applicable municipal ordinances. There is no practical reason or legal basis for differentiating among the sources of a registration restriction or requirement.

102. Each County or Municipal Defendant, as a matter of custom, policy, or practice, enforces not only the local ordinances applicable within its

jurisdiction, but also all applicable state criminal laws, including the Florida state laws being challenged here. *See, e.g.*, Fla. Stat. § 30.15(5).

103. Those arrested by law enforcement officers of the County & Municipal Defendants for violations of state registration laws are detained, as a matter of custom, policy, or practice, in county or municipal jail facilities.

104. The County & Municipal Defendants do not maintain their own sex-offender registries. They receive information from and collect information on behalf of FDLE to maintain and use the statewide registry with respect to registrants living within their geographic jurisdictions.

105. State law directs "[c]ounty and local law enforcement agencies" to work "in conjunction with [FDLE]" to "verify the addresses of sexual offenders" and requires them to "report to [FDLE] any failure by a sexual offender to comply with registration requirements." Fla. Stat. § 943.0435(6). And registrants ordinarily appear at county or municipal facilities to complete their in-person registration requirements under the state laws challenged here. County sheriffs' offices and other local police departments with which they "coordinate" or "enter into agreements" for assistance submit the registration information they collect to FDLE. *See* Fla. Stat. § 943.0435(4).

106. Conversely, state law directs FDLE to provide all registration information concerning a given offender to "[t]he sheriff of the county and, if

applicable, the police chief of the municipality, where the sexual offender plans to reside." Fla. Stat. § 944.606(2)(b).

107. Florida law authorizes the County & Municipal Defendants to "notify members of the community and the public" when a registered offender moves within their geographic jurisdictions. Fla. Stat. § 775.21(7)(a); *see also* Fla. Stat. § 944.606(3)–(4).

108. Each County or Municipal Defendant, from time to time, coordinates, combines, or acts in concert with law enforcement officers and other officials from FDLE acting under the direction and authority of Commissioner Glass to implement and enforce the state statutes and ordinances challenged in this suit.

109. For example, shortly after this lawsuit was filed, defendant Flagler County "partnered with the Florida Department of Law Enforcement and the Florida Department of Corrections to conduct Operation Offenders: Endgame," which was "a three-day operation focused on sex offenders and predators residing in Flagler County to confirm their compliance with Florida's registration requirements." *See* Sheriff's Office of Flagler County, News Release, "40 Sex Offenders/Predators Arrested in Operation Offenders: Endgame" (Aug. 28, 2026), https://perma.cc/6Z8T-LPSS.

110. For the operation, Flagler County and FDLE law enforcement officers, working in coordination, "made contact with 84 registrants, conducted

compliance checks, and arrested 39 sex offenders and one predator for . . . various registration offenses, including failure to report vehicles, phone numbers, email addresses, and internet identifiers, as well as knowingly providing false registration information." *Id*.

111. Soon thereafter, Jackson County conducted a similar coordinated enforcement operation. It likewise "partnered" with FDLE and the Department of Corrections on "Operation Sandspur," another "three-day operation [that] targeted career offenders, sexual offenders and sexual predators residing within Jackson County." FDLE, News, "21 Arrests in Operation Sandspur in Jackson County" (Sept. 23, 2026), https://perma.cc/YK8B-64MN. The operation led to the "arrest of 21 suspects" for "various registration offenses, including failure to report change of residence, vehicles, phone numbers, email addresses, and Internet identifiers, as well as knowingly providing false registration information." *Id.*

112. These coordinated enforcement efforts are not new. Indeed, it may be inferred that, as a matter of custom, policy, or practice, FDLE and each of the County or Municipal Defendants routinely undertake unified operations in service of a common purpose and shared law-enforcement objective. FDLE and the County & Municipal Defendants thus constitute a single entity or single enterprise with respect to enforcement and implementation of the challenged laws and ordinances.

113. On information and belief, each County or Municipal Defendant coordinates, combines, or acts in concert with FDLE from time to time in pursuit of a common design, plan, and objective.[1]

114. Each County or Municipal Defendant has knowledge and awareness of the customs, policies, and ordinances of the other County & Municipal Defendants, including the ordinances being challenged in this case and the custom, policy, or practice of each to coordinate with FDLE to enforce state, county, and municipal requirements and restrictions.

---

[1] In addition to the post-suit Flagler and Jackson operations, see for example: FDLE, News, "Months-long investigative efforts result in arrests of 5 sexual offenders" (June 5, 2026), https://perma.cc/VP2M-MC9N (describing an operation conducted "along with various local and state law enforcement agencies" to arrest "registered sexual offenders [for] unreported online accounts and email addresses"); FDLE, News, "17 Arrested in Operation Running Wild" (April 1, 2026), https://perma.cc/2RMW-WKTQ (describing an operation with Columbia County and Lake City "to confirm compliance with Florida's registration laws"); FDLE, News, "FDLE arrests absconded registered Indian River County sex offender" (May 20, 2025), https://perma.cc/H8DY-EAQU (describing a "a joint operation with the Indian River County Sheriff's Office to confirm that registered sexual predators and offenders are complying with Florida's registration laws"); FDLE, News, "18 Sexual Predators and Offenders arrested in two operations" (March 27, 2025), https://perma.cc/AA39-B73W (describing an operation with "the Alachua County Sheriff's Office (ACSO), the Columbia County Sheriff's Office (CCSO), [and] the Lake City Police Department" for "completing residential address checks"); FDLE, News, "44 arrested in Operation Matchmaker" (Feb. 14, 2025), https://perma.cc/JQQ6-PBYM ("Florida Department of Law Enforcement (FDLE) partnered with Tampa Police Department (TPD)" to arrest registrants "who had unreported online dating accounts"); FDLE, News, "FDLE launches Florida Safe Halloween" (Oct. 28, 2024), https://perma.cc/2FW6-XUTS (reporting that FDLE, "along with sheriff's deputies," "visited hundreds of registered sex offenders and predators this fall to confirm they were following Florida's registration laws"); FDLE, News, "Jefferson County SO and Monticello PD arrest three following offender operation" (March 5, 2024), https://perma.cc/8F85-3U3W (noting that FDLE partnered with the "Jefferson County Sheriff's Office and the Monticello Police Department" in "a county-wide operation to verify the addresses of registered offenders").

**D. The punitive nature of Florida's sex-offender registration scheme**

115. The original Florida registry statute adopted in 1997 as a mere reporting and notice law has over time, thanks to almost two dozen statutory amendments, grown more and more burdensome. The most recent amendment, adopted in March 2026 and effective July 1 of this year, removes all doubt: The scheme is punitive and unconstitutional at least five times over. Whatever the Eleventh Circuit previously has said about Florida's scheme or the schemes of other States in the Circuit, Florida's scheme today stands out as particularly, even uniquely, punitive.

116. Florida's registration scheme, like those of other states, "involves an affirmative disability or restraint" of liberty. *People In Interest of T.B.*, 489 P.3d 752, 766 (Colo. 2021) (holding that Colorado's scheme, as applied to juveniles, is cruel and unusual punishment in violation of the Eighth Amendment); *cf. Piasecki v. Court of Common Pleas*, 917 F.3d 161, 171 (3d Cir. 2019) (in case concerning the federal habeas standard for "custody," finding that, "[g]iven the level of restriction imposed by the [Pennsylvania sex-offender] registration requirements and the harsh consequences that would result from failing to adhere to them, we easily conclude that the restrictions placed on Piasecki were 'severe'").

117. Unlike when the Supreme Court considered Alaska's registration scheme more than 20 years ago in *Smith v. Doe*, 538 U.S. 84 (2003), Florida's

scheme now openly and extensively limits physical liberty. It is not just a public notification scheme. Under threat of reincarceration for failure to comply, a registrant must report in person to the local sheriff's office at least twice per year at specifically appointed times and give in-person notice prior to out-of-state travel; otherwise, simply taking a vacation is a felony. And a registrant cannot live where he chooses: Under Florida's residency restrictions for sex offenders, nearly one of every two housing units in Florida is off-limits. Compounded with county and municipal Residency Restriction Ordinances, the number is far higher. And in urban areas, it is worse still—in practical effect, all of Broward and Miami-Dade Counties are off limits to registered sex offenders looking for housing.

118. Florida's scheme promotes several traditional aims of punishment, including retribution, shaming, and incapacitation.

***1. Retribution and shaming***

119. Florida's registration scheme reflects lawmakers' and the public's judgment that registrants are morally culpable and deserving of punishment—that, with the scheme's limits on liberty, they are "getting what they deserve."

120. The principal proponent of the recently enacted HB 45, Representative Plakon, emphasized during the House debate that the scheme's residency restriction "only applies to severe sex offenders who have committed

crimes against children. Crimes against children!" March 11, 2026, House Debate (4:09:31–52). Representative Gossett-Seidman lectured, "Let's remember these sexual offenders made a choice." *Id.* (4:13:20–23). And Representative Steele, arguing in favor of the bill during a prior committee hearing, contended that registrants subject to the residency restriction "shouldn't be allowed out of prison" at all and "should stay in prison, rot in prison" forever. Feb. 24, 2026, House Judiciary Com. Hearing (25:45–53).

121. Apart from straight retribution and the concept of just deserts, many requirements of Florida's registration scheme "also resemble traditional shaming punishments." *Does #1–5 v. Snyder*, 834 F.3d 696, 701 (6th Cir. 2016) (holding that Michigan's sex offense registration scheme is punitive); *accord People v. Lymon*, 29 N.W.3d 58, 68 (Mich. 2024) (a prior version of Michigan's registration scheme, then resembling Florida's current scheme, "resembled the traditional punishments of banishment, shaming, and parole"). Of course, the classic example of a shaming punishment is Nathaniel Hawthorne's *The Scarlet Letter*, written in 1850, when some of the Founding Generation were still alive. The novel portrays the shunning of Hester Prynne in Puritan Boston, Massachusetts, emblazoned with the titular scarlet "A" representing her crime of adultery—placing her at the mercy of public humiliation for a sex crime.

122. Several features of Florida's sex-offender registration scheme bear strong resemblance to classical shaming punishments. Among other things, the identities and photos of registrants are publicly displayed on a website hosted by the Florida Department of Law Enforcement. FDLE allows search engines like Google to access individual-level information from the sex-offender registration database, meaning that any time a person searches a registrant's name on the internet, the fact of sex-offender registration often will appear as a top result. Moreover, officers are required routinely to visit registrants at their registered addresses, sending a signal to neighbors that they are dangerous people, inflicting shame and reputational harm. And registrants' government-issued IDs are marked prominently with "SEXUAL PREDATOR" (if denominated a sexual predator) or "943.0435" (if denominated a sexual offender) in brightly colored letters—almost literal scarlet letters. *See* Exhibit 5 at 45, 47.

***2. Incapacitation***

123. The point of incapacitation is to expel the offender from the community or restrict his liberty within it, like incarceration, parole, or probation. That is just what Florida's registration scheme does. *See Snyder*, 834 F.3d at 703 (a modern sex-offender registration scheme "resembles the punishment of parole/probation"). And it does so by design—the professed point of

exclusion zones is to keep known offenders away from particular communities and locations where children are understood to gather.

124. Representative Steele would go even further, arguing in respect to HB 45: "Ya know, I would love to see a sign that says 'Not Welcome in the State of Florida'" to "eradicate" registrants in the State "altogether." Feb. 24, 2026, H. Judiciary Com. (25:02–10). That position echoed testimony from Barney Bishop, CEO of the Florida Smart Justice Alliance. He excoriated opponents of HB 45, exclaiming that the legislature should "post a big 'Unwelcome!' sign at the state border of Florida and say 'Sex offenders, you're not welcome here! Go to another State! You don't have any rights!'" Nov. 5, 2025 House Crim. Justice Subcom. (40:29–40). He concluded "We shouldn't be doing a single, solitary thing to help them find a place to live in Tallahassee or in the State of Florida. They should be out of the State. So please support this good bill." *Id.* at 40:57–41:10.

125. These sentiments are nothing new. "[W]ith exclusion zones" as originally enacted in the early 2000s by Florida and other states, "there is a well-documented intent by lawmakers who pushed for and passed residency restriction laws to sever community connections with sex offenders." Corey Rayburn Young, *Banishment by a Thousand Laws: Residency Restrictions on Sex Offenders*, 85 Wash. U. L. Rev. 101, 137 (2007). Representative Susan Goldstein stated openly that the state's original residency restriction was

designed "to get these people out of our neighborhoods and hopefully our state." Jason Garcia, *State Cracks Down on Predators*, Orlando Sun Sentinel (Fla.), Sep. 14, 2005, at A1.

126. The residency restrictions work as intended, "resembl[ing], in some respects at least, the ancient punishment of banishment." *Snyder*, 834 F.3d at 701; *accord Lymon*, 29 N.W.3d at 68 (a prior version of Michigan's scheme that "prohibited registrants from living, residing, working, or loitering within 1,000 feet of a school" resembled "banishment"). The restrictions severely constrain registrants in their community interactions, often effectively expelling them from the community, preventing them from maintaining homes in population centers and, as a practical matter, from even being present there. *See generally* Young, *supra* at 135 ("Sex offender exclusion zones fit all . . . the elements of banishment.").

127. Historically understood, "banishment is the expulsion in fact of a person from a community . . . to a non-institutional setting" other than prison, so as to "sever ties to a community." *Id.* at 134. Banishment and its analogues date to classical antiquity and were familiar to the Founding Generation. *See* 1 William Blackstone, Commentaries *132; William Smith, *Dictionary of Greek and Roman Antiquities* 513–17 (1875) (discussing the punishment of *exsilium* as the "interdiction from certain places named" and *relegatio*, by

which "a person might be forbidden to live in a particular province, or in Rome, either for an indefinite or a definite time").

128. Ancient authorities frequently imposed banishment, relegation, or exile for sex offenses. *See, e.g.*, Nghiem L. Nguyen, *Roman Rape: An Overview of Roman Rape Laws From the Republican Period to Justinian's Reign*, 13 Mich. J. Gender & L. 75, 102 (2006) (explaining that for a member of the privileged class, the crime of rape or sexual assault of an underage girl would result in either relegation or exile); Thomas Habinek, *Imago Suae Vitae: Seneca's Life and Career*, in *Brill's Companion to Seneca: Philosopher and Dramatist* 9 (Brill ed. 2013) (detailing Seneca the Younger's sentence to eight years of exile for adultery with Caligula's sister, Julia Livilla).

129. The "overriding purpose" of banishment and similar punishments is "neither rehabilitation nor deterrence, but ridding [the community] of dangerous offenders" who have transgressed a categorical moral code. Wm. Garth Snider, *Banishment: The History of its Use and a Proposal for its Abolition Under the First Amendment*, 24 New Eng. J. on Crim. & Civ. Confinement 455, 462 (1998); *see also generally* Oxford University Research Archive, "Banishment and the pre-history of legitimate expulsion power," at 12 (2019) ("Banishment was often used to police violations of society's normative order, such as deviations from the moral code.").

130. Banishment has been understood as a cruel and unusual punishment since the Founding. The Grand Remonstrance detailed more than 200 grievances against King George I of England in 1641, reflecting the growing distrust of the Parliament concerning issues of religious policy and George I's authoritarian rule. The thirty-seventh entry complained of "banishments" and related excessive punishments "so rigid" as to have "deprived Men of the Society of their Friends, exercise of their Professions, comfort of Books, use of Paper or Inke, [and] even violated that neer Union which God hath establisht betwixt Men and their Wives, by forced and constrained separation." John D. Bessler, *Lost and Found: The Forgotten Origins of the "Cruel and Unusual Punishments" Prohibition*, 14 Br. J. Am. Leg. Studies 213, 355 (2025). That is a close description of Florida's registration scheme.

131. Tracing directly to the Grand Remonstrance, the tenth declaration of the English Bill of Rights of 1689 specified that "excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted." And as one scholar of the Founding Era noted, "The practice of banishing persons convicted of misdemeanors to distant prisons, is evidently contrary to the tenth clause of the [English] Bill of Rights, which prohibits the infliction of cruel and *unusual* punishments." Richard Phillips, *On the Powers and Duties of Juries, and on the Criminal Laws of England* 298 (2d

ed. 1813). The Tenth Declaration was, of course, the precursor to the U.S. Constitution's Eighth Amendment.

132. As the maps reproduced below demonstrate, the residency and presence restrictions of Florida's state registration scheme, on their own and in combination with the compounding county and municipal ordinances, strongly resemble traditional banishment. *Snyder*, 834 F.3d at 701; *accord Lymon*, 29 N.W.3d at 68. They effectively expel registrants from densely populated communities, preventing them from living in urban centers. They also effectively ban their presence there through loitering and similar laws, and they deprive them of the ability to work by revoking professional licenses and making mere presence at places of work unlawful. Registrants are thereby removed from the community, and their community ties are effectively severed—just as intended. *See generally* Exhibit 5.

133. For just these reasons, the County Court for the Seventeenth Judicial Circuit, which covers Broward County, recently ruled that Fort Lauderdale's residency restriction is punitive under the federal constitutional framework established in *Smith v. Doe*, 538 U.S. 84 (2003), and *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), because it "resembles banishment, a historical form of punishment." Exhibit 8 (Order Granting Defendants' Motions to Dismiss at 5, *City of Fort Lauderdale v. Anderson*, No. 17-003615MO10A (Mar. 26, 2018)).

134. The following maps demonstrate the total effect of the residency and presence restrictions in some of Florida's most populous locations, including Miami; Broward County, just north of Miami; and Jacksonville, which operates a consolidated government and is geographically coextensive with Duval County. *See* Exhibit 3 at 26, 31, 33, 38–39, 42.

135. In Miami and Broward, living and simply being present within city limits is essentially impossible. Even in Jacksonville—which in 2017 repealed a city-specific 2500-foot residency restriction because it encouraged homelessness—residency and daily presence within the I-295 beltway is nearly impossible. In these and similar areas across the State, registrants are at best relegated to the outskirts of town:

136.

State & County Residence Restriction Coverage
Miami, FL




500' Loitering Restriction Coverage
Miami, Florida



State & County Residence Restriction Coverage
Broward County, FL




500' Loitering Restriction Coverage
Broward County, FL



State & County Residence Restriction Coverage
Jacksonville, Florida




500' Loitering Restriction Coverage
Jacksonville, Florida



137. Other features of Florida's registration scheme confirm its punitive nature. Its consequences apply "only with respect to a criminal defendant and only after that defendant's conviction of a qualifying crime." *Ellingburg v. United States*, 607 U.S. 163, 166 (2026) (quotation marks omitted).

138. "At sentencing, [the registration requirement] is imposed together with other criminal punishments such as imprisonment and fines," typically as an express element of the final judgment. *Id.* With respect to offenses enumerated in the Florida Sexual Predators Act, "the sentencing court must make a written finding at the time of sentencing that the offender is a sexual predator." Fla. Stat. § 775.21(5)(a)(2).

139. Moreover, "when a defendant does not" comply with applicable registration requirements, "the court may . . . impose imprisonment." *Ellingburg*, 607 U.S. at 166. As evidence, *see supra* ¶¶ 108–113 & n.1. As another example, Miami-Dade County's Instagram page expressly encourages residents to contact its "Crime Stoppers" tip line to report registrants who have "absconded." *See* https://perma.cc/7L6B-XF9P.

140. "As a further sign that [sex-offender registration] is criminal punishment, the [registration] regime is codified in" Title 48 of the Florida Statutes, titled Criminal Procedure and Corrections. *Id.*

141. Lifetime community expulsion is also excessive in relation to the civil purpose asserted, which is preventing recidivism and protecting the

public. *See* Fla. Stat. § 775.21(5)(d); *see also People v. Kardasz*, -- N.W.3d --, No. 165008, 2025 WL 3691966, at *15 (Mich. 2025) (holding that the 2021 version of Michigan's sex-offender registration scheme "is excessive relative to its stated goals," amounting to punishment "despite a nonpunitive legislative intent").

142. A categorical lifetime penalty—isolating registrants from friends and family, and constantly reminding them of their past mistakes by requiring them to submit to highly intrusive and humiliating government supervision in perpetuity—does not permit registrants to remove themselves from the registry after any period of demonstrated rehabilitation, rendering good behavior and character improvement immaterial. *See, e.g.*, Exhibit 5 at 7–8, 13–14, 32–33, 49–50. A registrant who committed a sex offense early in life will be profoundly hindered in his education, relationships, and work for the rest of his days—even decades after committing his offense and completing his custodial sentence, and without regard for good and lawful behavior since.

143. This lifetime sentence of isolation and hardship is in addition to the term of imprisonment and government supervision determined by a judge already to be commensurate to the crime. Florida law already provides for enhanced criminal punishments (actually denominated as such) for "adult-on-minor sex offense[s]," resulting in substantially lengthened periods of incarceration and supervision. Florida Statutes Section 921.0024(1)(b) specifies

that if an adult "committed a sexual battery under chapter 794 or a lewd act under § 800.04 or § 847.0135(5) against [a] minor" victim, the defendant's "subtotal sentence points are multiplied by 2.0" unless the result produces a sentence in excess of the statutory maximum, in which case the statutory maximum applies.

144. Florida's registration scheme imposes extreme lifelong burdens *in addition to* the custodial sentence and terms of parole or probation determined by a judge to punish the offender sufficiently for his crime.

## CLAIMS FOR RELIEF

### Count 1: Violation of the Eighth Amendment
(against all defendants)

145. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

146. The combined effect of Florida's residency and presence restrictions is to exclude registrants from nearly half of all housing units throughout Florida, and virtually entirely from all urban and suburban population centers. In such areas, registrants can almost never obtain housing, and they risk criminal liability for ordinary presence there. These restrictions are similar to the Roman punishments of *exsilium* and *relegatio* and the more recent punishments of exile or banishment. They are no mere civil regulation.

147. In *McGuire v. Marshall*, 50 F.4th 986 (11th Cir. 2022), the Eleventh Circuit held that Alabama's registration scheme did not impose punitive

banishment. But that was because registrants in Alabama retained a meaningful ability to live and move within communities. Here, in contrast, the Florida scheme systematically eliminates those opportunities in urban and suburban areas and whole counties throughout the State.

148. Banishment and similar punishments are cruel and unusual according to both historical and present penological norms.

149. Sections 775.215, 856.022, 943.0435, and 944.607, and the Residency Restriction and Presence Restriction Ordinances, taken together, violate the federal Cruel and Unusual Punishments Clause. They are invalid on their collective face and in all their applications.

150. Sections 775.215, 856.022, 943.0435 and 944.607, the Residency Restriction and Presence Restriction Ordinances, taken together with all other challenged restrictions and limitations on registrants' liberty, have a cumulative effect that amplifies the constitutional harms imposed by each, meaning that they must be considered together as part of a single, multi-pronged, comprehensive exercise of state power which, taken as a whole, infringes the Eighth Amendment rights of FAC's members.

151. Alternatively or also, FDLE and each of the County or Municipal Defendants constitute a single entity or single enterprise with respect to enforcement and implementation of Sections 775.215, 856.022, 943.0435 and 944.607, and the Residency Restriction and Presence Restriction Ordinances,

making any differentiation among the defendants—all Florida state agencies and governmental subunits—legally impossible, improper, or unjust.

**Count 2: Conspiracy to Violate the Eighth Amendment**
(against all defendants)

152. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

153. Each County or Municipal Defendant willingly coordinates, combines, or acts in concert with FDLE to implement and enforce the state laws and ordinances challenged in this case as part of a common design with a shared purpose to deprive FAC's members of their constitutional rights under the Eighth Amendment as described in Count 1.

154. Defendants' coordinated, combined, or concerted activities include all activities undertaken to enforce or otherwise implement Sections 775.215, 856.022, 943.0435 and 944.607, and the Residency Restriction and Presence Restriction Ordinances, including by conducting joint, coordinated, correlated, aligned, or harmonized law enforcement activities.

155. Each County or Municipal Defendant understands and is aware that its pursuit of a common design with FDLE involves, by its nature, more than just coordination and concerted action between itself and FDLE and embraces similar coordination and concerted action between FDLE and all of the other County & Municipal Defendants.

156. Defendants are thus jointly and severally liable as co-conspirators with respect to the violation of the Eighth Amendment.

**Count 3: Violation of the *Ex Post Facto* Clause**
(against all defendants)

157. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

158. Sections 775.215, 856.022, 943.0435—taken alone or together with all of the challenged ordinances—inflict punishment subject to the *Ex Post Facto* Clause. *See, e.g.*, *Commonwealth v. Santana*, 266 A.3d 528, 476 (Pa. 2021) (holding that Pennsylvania's "registration provisions constitute punishment notwithstanding the General Assembly's identification of the provisions as nonpunitive," and "retroactive application of [the] registration provisions [therefore] violate the federal *Ex Post Facto* Clause") (quoting *Commonwealth v. Muniz*, 164 A.3d 1189, 1218 (Pa. 2017)); *People v. Smith*, 38 N.W.3d 736 (Mem.) (Mich. 2026) (similar).

159. Application of any element of Florida's sex-offender registration scheme—whether at the state, county, or municipal level—violates the federal *Ex Post Facto* Clause if that element was adopted or enacted after the registrant's offense conduct.

160. Every retroactive application of an element of Florida's sex-offender registration scheme is invalid and should be enjoined.

**Count 4: Violation of the Right to Travel**
(against Mark Glass in his official capacity
and the County Defendants)

161. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

162. The "right to remove from one place to another according to inclination" is "an attribute of personal liberty protected by the Constitution." *Morales*, 527 U.S. at 53 (quoting *Williams v. Fears*, 179 U.S. 270, 274 (1900)). "[M]oving from State to State" is "a constitutional right," and a State may not "penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest." *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969).

163. Section 943.0435(7) requires "[a] sexual offender who intends to establish a permanent, temporary, or transient residence in another state or jurisdiction other than the State of Florida" to "report in person to the sheriff of the county of current residence at least 48 hours before the date he or she intends to leave this state to establish residence in another state or jurisdiction or at least 21 days before the date he or she intends to travel outside of the United States."

164. Making it unlawful for registrants to depart for interstate or international travel for vacations or other trips of three days or longer without first providing in-person notice at a sheriff's office as required by Section

943.0435(7)—and requiring in-person notice of the cancellation of travel plans under paragraph (8)—is not necessary to serve a compelling governmental interest. To the extent Defendants cite a compelling governmental interest served, there are less restrictive means of achieving it.

165. Accordingly, Section 943.0435(7) and (8) and all other substantially similar Florida statutes or ordinances are unconstitutional on their faces, in all their applications.

**Count 5: Violation of the Right to Loiter for Innocent Purposes**
(against Mark Glass in his official capacity
and the Presence Restriction Defendants)

166. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

167. The inverse of the right to travel free from undue governmental restraint is the right "to remain in a public place of [one's] choice." *Morales*, 527 U.S. at 54 (citing *Kent v. Dulles*, 357 U.S. 116, 126 (1958)). "[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 53. Thus, a law that forbids "loitering [that is] harmless and innocent . . . is an unjustified impairment of liberty." *Id.* at 58.

168. For this reason, "laws that do not join the term 'loitering' with a second specific element of the crime" requiring a distinct "overt act" evidencing a "criminal intent" are generally unconstitutional. *Id.* at 57–58.

169. Section 856.022(3) and the Presence Restriction Ordinances criminalize innocent loitering. "The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts" later to determine on a case-by-case basis "who could be rightfully detained, and who should be set at large.'" *Morales*, 527 U.S. at 60 (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876)). It must tailor its criminal laws so they do not bar constitutionally protected conduct.

170. Section 856.022(3) and the Presence Restriction Ordinances are therefore unconstitutional, not just when an officer applies each to innocent presence, but when he applies each at all—in all their applications. Alternatively, they are unconstitutional at least as applied to innocent presence.

**Count 6: Violation of the Vagueness Doctrine**
(against Mark Glass in his official capacity
and the Vague Restriction Defendants)

171. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

172. A penal law is void for vagueness if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" or fails to establish guidelines to prevent "arbitrary and discriminatory enforcement" of the law. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

173. The fair-notice requirement thus serves two purposes. From the perspective of the citizen whose conduct is regulated, it "enable[s] the ordinary citizen to conform his or her conduct to the law." *Morales*, 527 U.S. at 58. This is essential, for "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Id.* (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). And from the perspective of the law enforcement officers who must apply the law's dictates, it forestalls the "potential for arbitrary enforcement." *Id.* at 56. A criminal law cannot leave room for officers or prosecutors to conduct "a standardless sweep . . . to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358.

174. Sections 856.022(3) and 856.022(4)(a) and the Vague Ordinances, which restrict conduct based on indefinite terms such as "loiter[ing]," "prowl[ing]," "children," "congregating," "regularly congregate," and "vicinity," fail to provide fair notice to the public. They do not specify a meaningful standard of culpable conduct, leaving registrants to guess what is forbidden and what is allowed. And they give no clear test or criteria to guide law enforcement officers applying the law. They are void for vagueness under the Due Process Clause.

175. Sections 856.022(3) and 856.022(4)(a) and the Vague Ordinances are unconstitutional on their faces, in all their applications. Again, "[t]he Constitution does not permit a legislature to 'set a net large enough to catch

all possible offenders, and leave it to the courts'" later to determine on a case-by-case basis "who could be rightfully detained, and who should be set at large." *Morales*, 527 U.S. at 60 (quoting *Reese*, 92 U.S. at 221). Sections 856.022(3) and 856.022(4)(a) and the Vague Ordinances are unconstitutional, not just when an officer applies unlawful discretion in an objectionable manner, but when he applies unlawful discretion at all.

**Count 7: Violation of the Right to Free Speech**
(against Mark Glass in his official capacity
and the Gag Ordinance Defendants)

176. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

177. Speaker-based and content-based speech bans are unconstitutional in all their applications unless the State satisfies strict scrutiny. *See, e.g.*, *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). This maxim has special force with respect to bans on political and religious speech. *See, e.g.*, *Republican Party of Minnesota v. White*, 536 U.S. 765, 774 (2002).

178. "To survive strict scrutiny," the State "must do more than [identify] a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest" (*Burson v. Freeman*, 504 U.S. 191, 211 (1992)) and "that it does not unnecessarily circumscribe protected expression" (*Republican Party*, 536 U.S. at 775).

179. Section 856.022(4)(a) and the Gag Ordinances are speaker-based and content-based speech prohibitions, banning core protected expression in traditional public forums. The bans are not narrowly tailored to achieve a compelling governmental purpose. Section 856.022(4)(a) and the Gag Ordinances are thus unconstitutional on their faces, in all their applications.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Declare that all of the challenged laws and ordinances, taken together, impose cruel and unusual punishment.

b. Declare that defendants may not retroactively apply any elements of Florida's sex offender registration scheme, including but not limited to new reporting requirements, residency restrictions, or presence restrictions.

c. Declare that Section 943.0435(7)–(8) unlawfully burdens the right to interstate travel.

d. Declare that Section 856.022(3) and the Presence Restriction Ordinances unconstitutionally criminalize innocent loitering.

e. Declare that Sections 856.022(3) and 856.022(4)(a) and the Vague Ordinances are unconstitutionally vague.

f. Declare that Section 856.022(4)(a) and the Gag Ordinances are unconstitutional restrictions on speech and expression.

g. Enjoin defendants from enforcing any of the foregoing laws, regulations, or ordinances in any manner inconsistent with the foregoing declarations of rights.

h. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

i. Grant such other relief as the Court deems just and proper.

Dated: September 29, 2026

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly (*pro hac vice*)
Winston Taylor LLP
1901 L Street NW
Washington, DC 20006
(202) 282-5096
michael.kimberly@winstontaylor.com

Megan Anne Casserlie (Bar No. 1032305)
Winston Taylor LLP
200 S. Biscayne Boulevard, Suite 1700
Miami, Florida 33131
(305) 910-0566
megan.casserlie@winstontaylor.com

*Attorneys for Plaintiff*
*Florida Action Committee, Inc.*