**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**FLORIDA ACTION COMMITTEE, INC.,**

*Plaintiff,*

**Case No. 4:26cv388-MW/MJF**

*v.*

**MARK GLASS, et al.,**

*Defendants.*
_________________________________/

**MIAMI-DADE COUNTY'S MOTION TO DISMISS THE AMENDED COMPLAINT, OR IN THE ALTERNATIVE, MOTION TO SEVER, AND SUPPORTING MEMORANDUM OF LAW**

Defendant Miami-Dade County (the "County"), pursuant to Federal Rule of Civil Procedure 12(b)(6), moves to dismiss the First Amended Complaint for Declaratory and Injunctive Relief [ECF No. 147] ("Amended Complaint"). In the alternative, the County moves to sever the claims against it under Rule 21.

## INTRODUCTION

For the second time now, Florida Action Committee ("FAC"), a non-profit advocacy organization, challenges the constitutionality of Miami-Dade County's Lauren Book Child Safety Ordinance (the "Ordinance"), which imposes a series of restrictions on registered sexual offenders and sexual predators under Sections 21-277 through 21-

285 of the County Code. For various procedural and substantive reasons, the Amended Complaint is due to be dismissed as to Miami-Dade County.

First and foremost, FAC already challenged the constitutionality of the Ordinance in 2014 and lost: United States District Judge Paul C. Huck dismissed FAC's claims, and the Eleventh Circuit affirmed his ruling. FAC's attempt to challenge the Ordinance again is thus barred by res judicata.

Should the Court reach beyond this threshold issue, there are independent grounds to dismiss the Amended Complaint for substantive reasons. Accordingly, all counts should be dismissed on the merits. In the alternative, the County is due to be severed from this lawsuit because the Amended Complaint runs afoul of Federal Rule of Civil Procedure 20(a)(2).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Enactment of the County's Ordinance

In 2005, the Miami-Dade Board of County Commissioners ("BCC") enacted Ordinance No. 05-206, which created Sections 21-277 through 21-284 (Article XVII) of the MIAMI-DADE COUNTY CODE (the "Ordinance").[1] The Ordinance prohibited individuals convicted of certain sexual offenses from residing within 2,500 feet of any

[1] Under its original version, the Ordinance applied to unincorporated Miami-Dade County and all municipalities that did not adopt a resolution specifying that the Ordinance would not apply. Because these provisions were subsequently amended, a copy of the original ordinance is attached as ***Exhibit A***.

school in particular areas of Miami-Dade County, and it restricted their access to parks and child care facilities. Ex. A §§ 21-281, -282, & -284. Having found that "[r]epeat sexual offenders, sexual offenders who use physical violence and sexual offenders who prey on children . . . present ***an extreme threat to the public safety***[,]" the stated intent of the Ordinance was to address "the County's compelling interest to promote, protect and improve the health, safety and welfare of the citizens of the County, particularly children, by prohibiting sexual offenders and sexual predators from establishing temporary or permanent residence in certain areas where children are known to regularly congregate, . . . and to restrict sexual offenders' and sexual predators' access to parks and child care facilities." *Id.* at § 21-278 (emphasis added).

In 2010, the BCC amended the Ordinance, adding Section 21-285, which made it unlawful for any sexual offender/predator to loiter or prowl with the intent to commit a sexual offense while knowingly within a child safety zone.[2] The amendment also preempted and repealed all municipal regulations relating to sexual offender/predator residency requirements and made the relevant portions of the County Code applicable throughout incorporated and unincorporated Miami-Dade County. *See* Ex. B § 21-279; *see also* Am. Compl. ¶ 64(a). Since then, apart from renaming the Ordinance, there have

[2] A copy of proposed ordinance No. 10-1 is attached as ***Exhibit B***.

been no subsequent amendments or material changes.[3]

### B. FAC Challenges the Constitutionality of the Ordinance in 2014

In 2014, FAC and three convicted sexual offenders (John Does #1, #2, and #3) sued Miami-Dade County pursuant to 42 U.S.C. § 1983, seeking a declaration that the Ordinance was void for vagueness, violated their substantive due process rights, and was an unconstitutional *ex post facto* law. *See Doe v. Miami-Dade County*, No. 14-23933, Compl. at ECF No. 1 & Am. Compl. at ECF No. 25 (case referred to throughout as "*FAC I*").[4] The district court dismissed the plaintiffs' claims with prejudice, finding that the Ordinance did not, on its face, violate the *Ex Post Facto* Clause and was not void for vagueness. *Doe #1 v. Miami-Dade County*, No. 14-23933, 2015 WL 13389882, at *3–7 (S.D. Fla. Apr. 3, 2015), *aff'd in part, rev'd in part, and remanded sub nom. Doe v. Miami-Dade County*, 846 F.3d 1180 (11th Cir. 2017). Also, the court found that the Ordinance "rationally advances the legitimate governmental purpose of protecting children from the risk of recidivism posed by convicted sex offenders," thus precluding the plaintiffs' substantive due process claims. *Id.* at 16–20.

FAC and the Doe plaintiffs appealed the dismissal order, which the Eleventh Circuit affirmed as to FAC and Doe #2, and reversed as to Does #1 and #3, finding

---

[3] The Ordinance was renamed the "Lauren Book Child Safety Ordinance" in 2010. *See* proposed ordinance No. 10-67, attached as ***Exhibit C***.

[4] Copies of the Complaint and the Amended Complaint from *FAC I* are attached as ***Exhibits D*** and ***E***, respectively.

they alleged sufficient facts to raise plausible *ex post facto* claims as to the County's residency restriction. *Id.* at 1186. While the Doe plaintiffs pursued the case upon remand, ultimately losing at trial, FAC did not. *See Doe v. Miami-Dade County*, No. 14-23933, Am. Compl., ECF No. 90 (S.D. Fla. Oct. 5, 2017) (identifying the plaintiffs as John Does #3–#7).

### C. FAC Challenges the Constitutionality of the Ordinance Again Here

In this case, FAC again seeks declaratory and injunctive relief determining that the Ordinance is unconstitutional. *See generally* Am. Compl. Also named as defendants are Mark Glass, in his official capacity as Commissioner of the Florida Department of Law Enforcement ("FDLE"), along with thirty-one counties and fifteen municipalities. *Id.* ¶¶ 28–29. In total, FAC challenges over 100 municipal provisions, *see id.* Ex. 2, and four separate Florida statutes. As to the County, FAC challenges Sections 21-281, -282, -284, and -285 of the Ordinance.[5] *Id.* at 3.

The Amended Complaint divides Defendants into four groups: (1) Residency Restriction Defendants; (2) Presence Restriction Defendants; (3) Vague Ordinance Defendants; and (4) Gag Ordinance Defendants. Am. Compl. ¶¶ 31–34 & Ex. 2. As to the County, the Amended Complaint labels §§ 21-281 and 21-282 as "Residency Restrictions," §§ 21-284 and 21-285 as "Presence Restrictions," and parts of § 21-285

---

[5] A copy of the Ordinance in its entirety is attached as ***Exhibit F***.

as fitting within the categories of "Vague Ordinances" and "Gag Ordinances." *See* Am. Compl. Ex. 2 at 3.

The Amended Complaint frames seven counts challenging the County's Ordinance. Count 1 raises an Eighth Amendment challenge to the residency and presence restrictions, claiming these provisions eliminate housing opportunities for sexual offenders to the point of legal "banishment," amounting to cruel and unusual punishment. Am. Compl. ¶¶ 145–51. Count 2 purports to allege that all Defendants engaged in a "Conspiracy to Violate the Eighth Amendment" by enforcing state statutes and ordinances. *Id.* ¶¶ 152–56. Count 3 attacks the Ordinance's residency and presence restrictions as inflicting punishment subject to the *Ex Post Facto* Clause. *Id.* ¶¶ 157–60. Count 4 alleges that Mr. Glass in his official capacity and the "County Defendants" violated Plaintiff's right to interstate travel. *Id.* ¶¶ 161–65. Count 5 asserts that the Ordinance's presence restrictions criminalize innocent loitering, amounting to a Fourteenth Amendment due process violation. *Id.* ¶¶ 166–70. In Count 6, FAC alleges that the Ordinance restricts conduct based on indefinite terms and is therefore void for vagueness under the Due Process Clause. *Id.* ¶¶ 171–75. Finally, Count 7 challenges the Ordinance as imposing unconstitutional speaker- and content-based speech restrictions that are not narrowly tailored to achieve a compelling governmental purpose. *Id.* ¶¶ 176–79. FAC seeks a declaration that each of the challenged provisions is unconstitutional and it requests an injunction barring Defendants from enforcing them. *Id.* at 66, Prayer for Relief ¶¶ (a)–(i).

## MEMORANDUM OF LAW

The Court should dismiss the claims against Miami-Dade County because a previous court of competent jurisdiction already heard FAC's claims pertaining to the same Ordinance and rejected them; therefore, this case is barred by the doctrine of res judicata.

Separately, the Amended Complaint is an impermissible shotgun pleading. The Eleventh Circuit has long condemned the kind of complaint "where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). The Amended Complaint does just that. Count 2 "realleges and incorporates ***all*** [151] prior paragraphs," sweeping in every fact alleged as well as the entirety of Count 1. Am. Compl. ¶ 152. Counts 3 through 7 do the same. *See id.* ¶¶ 157, 161, 166, 171, & 176. The County is thus left to guess at which allegations support which claims against which of the 48 defendants, an especially difficult task given that each entity sued has its own distinct restrictions on sexual offenders. *See Weiland*, 792 F.3d at 1323. The Amended Complaint should be dismissed as a shotgun pleading.

In the unlikely event the Court reaches the merits of the claims against the County, none survive dismissal because the Ordinance is still constitutional, just as it was in 2014 when FAC first challenged it. Finally, and in the alternative, the County should be severed from this case altogether.

## FAC's Claims Against the County Are Barred by Res Judicata

In 2014, FAC litigated—and lost—a constitutional challenge to the very same Miami-Dade County Ordinance that is at issue here. That case ended in a final judgment on the merits against FAC and in favor of the County. Since then, the Ordinance has not been amended. As a result, FAC's claims in this case are barred by res judicata.

### A. Legal Standard

"The doctrine of res judicata, or claim preclusion, bars the filing of claims which were raised or could have been raised in an earlier proceeding." *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990). Res judicata bars a subsequent action if: (1) there was a final judgment on the merits; (2) the prior decision was rendered by a court of competent jurisdiction; (3) the same parties or their privies were involved in both suits; and (4) the same cause of action is involved in both cases. *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1325 (11th Cir. 2020). Regarding the fourth element, "if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, . . . the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata." *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1239 (11th Cir. 1999) (quoting *Citibank*, 904 F.2d at 1503). Accordingly, "res judicata applies not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact." *TVPX ARS*, 959 F.3d at 1325 (citing *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 n.3 (11th Cir. 2002)). In deciding whether res judicata

applies at the motion to dismiss stage, the Court may take judicial notice of court records from prior proceedings. *See Harrell v. Bank of Am., N.A.*, 813 F. App'x 397, 400 (11th Cir. 2020).

### B. All Four Elements of Res Judicata Are Satisfied

All four elements of res judicata exist in this case. To begin, "dismissal of a complaint with prejudice satisfies the requirement that there be a final judgment on the merits." *Citibank*, 904 F.2d at 1501; *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981) ("The dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a judgment on the merits."). Indeed, "[t]he phrases 'with prejudice' and 'on the merits' are synonymous terms, both of which invoke the doctrine of claim preclusion." *Id.*

In adjudicating *FAC I*, Judge Huck dismissed with prejudice all of FAC's claims against the County—which included its constitutional challenges to the same Ordinance at issue here—for failure to state a claim under Rule 12(b)(6). *See Doe #1*, 2015 WL 13389882, at *9. The Eleventh Circuit affirmed FAC's dismissal. *See Doe*, 846 F.3d at 1182. Thus, a final judgment on the merits was entered against FAC, satisfying the first element of res judicata.

The second and third elements are easily met as well. There is no question that the order of dismissal was entered by a court of competent jurisdiction. Judge Huck had subject matter jurisdiction over FAC's claims under 28 U.S.C. §§ 1331 and 1343(a)(3) as well as personal jurisdiction over the parties. *See* Ex. E ¶¶ 11–13. The

Eleventh Circuit, in turn, had jurisdiction over the appeal under 28 U.S.C. § 1291, so its decision affirming dismissal of FAC's claims was likewise rendered by a court of competent jurisdiction. FAC was the plaintiff and the County the defendant in both cases, thereby satisfying the third element of res judicata.

The fourth and final element of res judicata—that both cases involve the same causes of action—is also satisfied here. "The principal test for determining whether the causes of action are the same is whether the primary right and duty are the same in each case." *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986). That analysis requires the court to "compare the substance of the actions, not their form." *Id.* "In other words, a court must look to the factual issues to be resolved [in the second cause of action], and compare them with the issues explored in the first cause of action." *Citibank*, 904 F.2d at 1503 (cleaned up). "It is now said, in general, that if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, that the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata." *Id.* (quotation omitted). This means res judicata bars not only claims that were actually litigated in the prior suit, but also claims that ***could have been raised*** but were not. *Ragsdale*, 193 F.3d at 1238.

The same-cause-of-action requirement is satisfied in this case. For starters, both cases present the same question: whether the Ordinance, which has not been amended since the first lawsuit, is unconstitutional because it impacts the rights of registered sex offenders. In 2014, FAC sued the County claiming the Ordinance unlawfully burdened

its members' housing, liberty, and due process rights. *See generally* Exs. D & E. In this lawsuit, FAC once again claims the same Ordinance violates its members' constitutional rights. *See generally* Am. Compl. That the current case seeks redress under different constitutional amendments and targets additional provisions of the same Ordinance is of no moment because it all arises from the "nucleus of operative fact" common to both cases: the regulation of registered sex offenders within the County. *See Citibank*, 904 F.2d at 1503.

In this case, FAC raises many of the same issues as it did in *FAC I*. For example, in 2014, FAC pursued an *ex post facto* challenge to the Ordinance; it makes the very same claim here. *Compare* Ex. E ¶¶ 174–76, *with* Am. Compl. ¶¶ 157–60. Along the same lines, FAC has repackaged its 2014 due process claims as an Eighth Amendment claim in Count 1. *Compare* Ex. E ¶¶ 159–73, *with* Am. Compl. ¶¶ 145–51. Both lawsuits target residency restrictions and the effect they have on housing options for sex offenders. *Compare* Ex. E ¶¶ 160, 172, *with* Am. Compl. ¶ 146. FAC's relabeling of claims has no effect on the application of res judicata because FAC "cannot avoid preclusion by grounding [its] second action on a different theory of liability." *Hart v. Yamaha-Parts Distribs., Inc.*, 787 F.2d 1468, 1470 (11th Cir. 1986). "Claim preclusion extends not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same 'operative nucleus of fact.'" *Id.* (quoting *Olmstead v. Amoco Oil Co.*, 725 F.2d 627, 632 (11th Cir. 1984)).

The remaining claims against the County, which challenge Sections 21-284 and 21-285, are barred not because FAC actually litigated them in 2014, but because it could have. *See Ragsdale*, 193 F.3d at 1238. Whether a claim could have been raised turns on whether it arises from the same transaction as the claims actually litigated—that is, whether the facts are "related in time, space, origin, or motivation" and "form a convenient trial unit." *Id.* at 1239 n.8 (citations omitted). The provisions just mentioned were part of the Ordinance in 2014. FAC could have challenged them then, but chose not to.

Permitting FAC to proceed now with claims it could have brought then defies the central purpose of res judicata, which recognizes that a "full and fair opportunity to litigate protects [a party's] adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States,* 440 U.S. 147, 153–54 (1979). FAC's concoction of additional legal theories twelve years after losing its case does not entitle it to a second bite at the apple. Accordingly, the Court should dismiss Miami-Dade County because the claims asserted against it are barred by res judicata.

**FAC'S EIGHTH AMENDMENT AND EX POST FACTO CLAIMS (COUNTS 1 & 3) FAIL BECAUSE THE ORDINANCE IS NOT PUNITIVE**

Even if the Court reaches beyond res judicata to address the merits, the Amended Complaint fails as to Miami-Dade County. Counts 1 and 3 challenge §§ 21-

281 and 21-282 (the "Residency Restriction Ordinances") and §§ 21-284 and 21-285 (the "Presence Restriction Ordinances"). Am. Compl. ¶¶ 145–51, 157–60.

As an initial matter, the Amended Complaint challenges forty-eight different defendants' laws as collectively violative of the Eighth Amendment and the *Ex Post Facto* Clause, bypassing any individualized analysis of the individual laws themselves. Am. Compl. ¶¶ 149–50 (the state, county, and municipal laws violate the Eighth Amendment only when "considered together" or "on their collective face."); ¶ 158 (all challenged laws "alone or taken together" violate the *Ex Post Facto* Clause). If adopted, FAC's approach could penalize Miami-Dade County for a constitutional violation committed in another part of the state by another defendant.

To begin, nothing in American jurisprudence suggests that the Court can conduct a collective constitutional analysis in this aggregate. In fact, prevailing law suggests that the Court must do just the opposite and individually evaluate whether each challenged law violates the Constitution. *See, e.g., McGuire v. Marshall*, 50 F.4th 986, 1001–02 (11th Cir. 2022) (considering intent of the particular government body that enacted the law and gauging the text and structure of a "statute," singular); *Wallace v. New York*, 40 F. Supp. 3d 278, 305–31 (E.D.N.Y. 2014) (in challenge to state and local sex offender registration and residency restriction laws, analyzing challenged laws individually, not collectively). The law does not support this "collective violation" theory of liability, and the Court may dismiss Counts 1 and 3 on that basis alone.

The Court should also dismiss Counts 1 and 3 against the County because its Ordinance is not punitive in nature. Count 1 alleges the provisions "systematically eliminate housing opportunities" for sexual offenders, akin to banishment and thus cruel and unusual punishment. Am. Compl. ¶¶ 145–51. Count 3 alleges the Ordinance inflicts punishment barred by the *Ex Post Facto* Clause. *Id.* ¶¶ 157–60. Yet only punitive laws implicate the *Ex Post Facto* Clause and the Eighth Amendment. *See McGuire*, 50 F.4th at 1001 ("Because the *Ex Post Facto* Clause prohibits the retroactive application only of laws imposing punishment, a statutory scheme that is civil and regulatory in nature rather than criminal may apply retroactively without violating the Constitution."); *Helling v. McKinney*, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting) ("To state a claim under the Cruel and Unusual Punishments Clause, a party must prove not only that the challenged conduct was both cruel and unusual, but also that it constitutes *punishment*.").

The test for whether a law is punitive is the same under the Eighth Amendment and the *Ex Post Facto* Clause. *See Smith v. Doe*, 538 U.S. 84, 97 (2003) (explaining that factors applied to determine whether a civil scheme is punitive "migrated into [ ] ex post facto case law from double jeopardy jurisprudence" and "have their earlier origins in cases under the Sixth and Eighth Amendments"). Both apply the two-step "intent-effects" test. *Id.* Step one asks whether the enacting body "intended to impose punishment." *McGuire*, 50 F.4th at 1001. If not, the question is whether the law is "'so

punitive either in purpose or effect as to negate' . . . intent to deem it civil." *Id.* (quoting *Smith*, 538 U.S. at 92).

Step one "consider[s] the statute's text and its structure." *Id.* at 1002. "When the legislature states in a statute's text that the objective of the statutory scheme is to protect the public, it indicates an exercise of the State's power to protect the health and safety of its citizens and evidences an intent to enact a civil regulatory scheme." *Id.* Because "considerable deference must be accorded to the [law's stated] intent[,]" "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty[.]" *Smith*, 538 U.S. at 92–93 (cleaned up).

At step two, courts weigh several factors to determine whether a law's punitive effect outweighs its civil intent. *Id.* at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)). These include whether the law: (1) has been historically regarded as punishment; (2) imposes affirmative disability or restraint; (3) promotes traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; or (5) is excessive relative to its purpose. *Id.*

**A. The County's Legislative Findings Establish Nonpunitive Intent**

The Ordinance was intended to create a nonpunitive civil scheme to protect the public, as its text expressly states: it is meant "to serve the County's compelling interest to promote, protect and improve the health, safety, and welfare of the citizens of the County, particularly children . . ." Ex. F § 21-278(b); *see also* Ex. A at 6 § 1 (providing

the "recitals of legislative intent and findings are fully incorporated [ ] as part of the ordinance"). And "where a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment." *Smith*, 538 U.S. at 93–94 (cleaned up).

Indeed, Judge Huck already found the Ordinance's intent nonpunitive in *FAC I*. *See Doe #4 v. Miami-Dade County*, No. 14-23933, 2018 WL 10780510, at *15 (S.D. Fla. Dec. 18, 2018). He relied on its text and whereas clauses, which cite the "legitimate, nonpunitive government objective" of "[p]rotecting children from sex offenders." *Id.* at *14. He also found its scope reflected nonpunitive intent because it limited residency restrictions to schools, included a grandfather clause, and preempted stricter municipal ordinances. *Id.* at *15.

Because the Residency and Presence Restrictions belong to the same Ordinance and the same intent provision (§ 21-278) considered in *FAC I*, the same outcome follows: the intent is nonpunitive. *See* 2018 WL 10780510, at *14–15; Ex. F § 21-278. Therefore, neither the Cruel and Unusual Punishments Clause nor the *Ex Post Facto* Clause is implicated by these restrictions.

### B. The Ordinance Has No Punitive Effect

Absent punitive *intent*, FAC must establish by the "clearest proof" that the Ordinance has a punitive *effect*. *Smith*, 538 U.S. at 92; *see also United States v. W.B.H.*, 664 F.3d 848, 855 (11th Cir. 2011) ("[S]ome evidence will not do; substantial evidence will

not do; and a preponderance of the evidence will not do. '[O]nly the clearest proof' will do.") (quoting *Smith*, 538 U.S. at 92). The question is thus whether the Restrictions are punitive in effect under *Smith*'s multi-factor test. *See McGuire*, 50 F.4th at 1003. They are not, as Judge Huck already found as to residency. *See Doe #4*, 2018 WL 10780510, at *15–22.

First, the Ordinance "cannot be equated to the historical punishment of banishment." *Wallace*, 40 F. Supp. 3d at 316. Although FAC calls the Restrictions banishment or relegation, Am. Compl. ¶¶ 146–148, *Doe #4* rejected that characterization at least as to Section 21-281 because the Ordinance "does not restrict where registered sex offenders may visit or work, and only prohibits them from residing within close proximity to a school." 2018 WL 10780510, at *15 (citing *Doe v. Miller*, 405 F.3d 700, 719 (8th Cir. 2005) (rejecting argument that residency restriction is equivalent to banishment because it does not completely expel offenders from the community); *Shaw v. Patton*, 823 F.3d 556, 566–67 (10th Cir. 2016) (same)).

The Presence Restrictions (§§ 21-284, -285) fit the banishment analogy even less, as they limit only temporary presence in specific locations and circumstances. Section 21-284 excludes offenders from (1) parks when they know a child under 16 is present and (2) child care facilities, with certain exceptions. Section 21-285 is intent-based—it bars only loitering or prowling while knowingly in a child safety zone, when children are present, and engaging in overt conduct that "manifests an intent to commit a sexual

offense." Ex. F § 21-285. Absent the requisite *mens rea* and an overt act evidencing intent, the provision restricts no one's movement.

The Eleventh Circuit and other courts have held far more restrictive laws do not amount to banishment or other punishment. *See, e.g., McGuire*, 50 F.4th at 1009–10 (statute barring offenders from residing, working, or volunteering in exclusion zones, irrespective of intent, did not resemble banishment, as it did not "expel them from the community," "cut them off from interacting with other adults," or prevent them from interacting with minors except in circumstances covered by statute); *Pennington v. Taylor*, 776 F. Supp. 3d 1118, 1147 (M.D. Ala. 2025) (statute did not resemble parole or probation where violation created prosecution separate from that for original offense, unlike parole); *cf. Wallace*, 40 F. Supp. 3d at 317 (residency restrictions did not resemble banishment because they allowed offenders to "venture into restricted areas, even if they cannot reside there and/or access such areas during school hours"). The Presence Restrictions—which bar only loitering with intent to commit sexual offenses and presence in parks and child care facilities, except as a parent of a child there—hardly effect "the complete expulsion of an offender from a community," which has been "[t]he common feature of banishment[ ] throughout the ages[.]" *Shaw,* 823 F.3d at 567.

As *Doe #4* concluded as to residency, "while the Ordinance imposes an affirmative disability or restraint, it is nonpunitive." 2018 WL 10780510, at *16 (citing *Shaw*, 823 F.3d at 570). That reasoning applies equally to Section 21-281's residency restrictions and Sections 21-284 and -285's presence restrictions. "Although sex

offenders to whom these restrictions apply may be less free than the average person to live or even travel where they want, these restrictions are not the equivalent of imprisonment, and the offenders are not akin to prisoners, without any freedom of movement." *Wallace*, 40 F. Supp. 3d at 317; *see also, e.g., McGuire*, 50 F.4th at 1011 (imposition of an affirmative disability or restraint "does not inexorably lead to the conclusion that the government has imposed punishment" unless it is so punitive as to outweigh nonpunitive intent); *Pennington*, 776 F. Supp. 3d at 1149 (finding that while the state's restrictions furthered the incapacitation of sex offenders to some extent, "[the law's] pursuit of incapacitation is insufficient to render it punitive.").

Third, the Ordinance does not promote the traditional aims of punishment. *Smith*, 538 U.S. at 97. "[T]he mere presence of a deterrent purpose" does not make regulation punishment, *id.* at 101, absent an "expression of condemnation" "clear or strong [enough] to negate . . . stated nonpunitive intent." *McGuire*, 50 F.4th at 1013. The Ordinance has no such expression; rather, its "goal is to prevent sex offenders from reoffending by limiting their access and opportunity, [therefore] it is remedial, not retributive." *Doe #4*, 2018 WL 10780510, at *16. The same is true of the Presence Restrictions, which likewise limit sex offenders' presence in specified areas. This distinguishes the Ordinance from the punitive restitution scheme at issue the case cited at paragraph 137 of the Amended Complaint, which the Supreme Court expressly contrasted with the civil sex offender registration requirements in *Smith v. Doe*. *See*

*Ellingburg v. United States*, 607 U.S. 163, 168 (2026) (contrasting MVRA and sex offender registration mandate).

Finally, the Ordinance is rationally connected to a nonpunitive purpose and not excessive relative to it. The Supreme Court calls this connection "a most significant factor" in whether a law's effects are punitive. *Smith*, 538 U.S. at 102 (cleaned up). The question is "whether it would be rational for a legislature to draw [its] conclusions" justifying the law. *McGuire*, 50 F.4th at 1014.

In *Doe #4*, Judge Huck found that the Ordinance, through § 21-281, is a "legitimate means to manage" the risk of offender recidivism, like residency restrictions approved by courts nationwide. 2018 WL 10780510, at *17–18 (collecting cases). The same goes for §§ 21-284 and -285, which are likewise "rationally connected to the County's goal of protecting children." 2018 WL 10780510, at *17. Serving the same purpose as § 21-281, they too satisfy this factor. *See, e.g., McGuire*, 50 F.4th at 1014 (concluding "it was rational . . . to conclude that sex offenders pose a risk of committing future sex crimes against children."); *Pennington*, 776 F. Supp. 3d at 1151 ("Restricting offenders' ability to be in close proximity to children—such as in the case of the loitering, . . . restrictions—is rationally related to ensuring those child safety and reducing the risk of recidivism") (cleaned up); *Smith*, 538 U.S. at 103 ("The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class.") (cleaned up).

As to excessiveness, *Doe #4* found § 21-281 not excessive in relation to its purpose. 2018 WL 10780510, at *20–21. Indeed, it found the Ordinance less restrictive than comparable laws "because of its grandfather clause which exempts residences established prior to the enactment of the Ordinance or the opening of a new school." *Id.* at *19 (citing *Shaw*, 823 F.3d at 570, which found that the grandfather clause made ordinance "less disabling than other state laws that require sex offenders to relocate if they live in an area that had been compliant but became non-compliant because of an intervening opening of a nearby school, playground, park, or child care center"); *see also Wallace*, 40 F. Supp. 3d at 326 ("[A]ny excessiveness ... is further mitigated by the grandfather clauses exempting an offender's prior-established residence."). *FAC I*'s reasoning, together with the Presence Restrictions' limited scope and intent requirements, likewise defeats any claim that they are excessive. *See Pennington*, 776 F. Supp. 3d at 1151 (finding statute not excessive because "[e]xcluding those offenders from that narrow category of areas for those limited purposes . . . is a reasonable means of protecting child safety and reducing the risk of recidivism.").

At bottom, the Amended Complaint does not establish that Sections 21-281, 21-282, 21-284, and 21-285 were enacted with punitive intent or have punitive effect. They therefore do not implicate the Eighth Amendment or the *Ex Post Facto* Clause, and Counts 1 and 3 should be dismissed as to Miami-Dade County.

## THE COURT SHOULD DISMISS COUNT 2 BECAUSE THE ALLEGATIONS OF CONSPIRACY ARE CONCLUSORY

Count 2 is a conspiracy claim in name only, and it comes nowhere close to stating a cognizable right to relief. Its real purpose is to divert attention from the most obvious defect in this case, which is the misjoinder of forty-eight defendants in a single action challenging over 100 separate laws, as discussed *infra*.

Although it doesn't say so expressly, FAC appears to seek relief under a § 1983 theory of conspiracy. FAC alleges that Miami-Dade County "willingly coordinates, combines, or acts in concert with FDLE to implement and enforce the state laws and ordinances challenged in this case . . . to deprive FAC's members of their constitutional rights under the Eighth Amendment." [ECF No. 147 ¶ 153]. The "activities" FAC alleges Defendants conspire to engage in include enforcing the challenged statutes and ordinances. *Id.* ¶ 154. All said though, not one allegation describes ***anything*** specific Miami-Dade County did in coordination or concert with any state or local government entity to deprive anyone of their civil rights. This manner of pleading a § 1983 conspiracy claim cannot survive dismissal.

### A. The Amended Complaint Comes Up Short of What's Needed to Plead a § 1983 Conspiracy

Although "[c]onspiring to violate another person's constitutional rights violates section 1983," *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002), "a defendant must be informed of the nature of the conspiracy which is alleged." *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984). "It is not enough to simply aver in the

complaint that a conspiracy existed." *Id.* And, "[c]onclusory allegations of an agreement, without any factual basis to make the allegations plausible, are insufficient to state a conspiracy claim." *C.H. by Hilligoss v. Sch. Bd. of Okaloosa Cnty.*, No. 18-2128, 2019 WL 4774042, at *23 (N.D. Fla. Sept. 30, 2019).

To plead a § 1983 conspiracy claim, a plaintiff must allege: "(1) a violation of his federal rights under color of state law; (2) an understanding among the defendants to violate those rights; and (3) a resultant actionable harm." *C.H.*, 2019 WL 4774042, at *23 (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010); *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008)). Conspiracy must be pled with ***particularity***; conclusory statements, as already mentioned, will not do. *Ghee v. Comcast Cable Commc'ns, LLC*, No. 22-12867, 2023 WL 3813503, at *2 (11th Cir. June 5, 2023); *Youngblood v. Fla. Dep't of Health*, 224 F. App'x 909, 915 (11th Cir. 2007). Yet generalized facts and conclusions are all FAC offers.

FAC's conspiracy claim fails at prong one because, as shown above, the Ordinance does not violate the Eighth Amendment. Without an underlying constitutional violation, there is no conspiracy claim. *Woodard v. Town of Oakman, Ala.*, 970 F. Supp. 2d 1259, 1274 (N.D. Ala. 2013).

It also misses the mark on the "understanding" prong of conspiracy. Agreement is the "linchpin" of any conspiracy, *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1122 (11th Cir. 1992), and it must be pled with particularity for a claim for conspiracy under § 1983 to survive dismissal. *C.H.*, 2019 WL 4774042, at *24

(dismissing conspiracy claims that lacked "any particularized factual allegation" of agreement). Put otherwise, "[i]t is not enough to state that defendants 'reached an agreement.' Plaintiff must assert facts to demonstrate such agreement." *Moon v. Boyd*, 727 F. Supp. 3d 829, 845 (E.D. Mo. 2024). Agreement also "presupposes communication." *Bailey*, 956 F.2d at 1122. Yet, apart from generic allegations about enforcing laws on the books, nothing suggests that the State and the County, let alone the County and forty-six ***other*** cities and counties, communicated about enforcing their varied ordinances as part of a master plan to violate the rights of sexual offenders.

Instead, the Amended Complaint simply recites the elements of a conspiracy claim. *See, e.g.*, Am. Compl. ¶¶ 153, 155–56. And the few facts it offers do not support these conclusions of law. FAC alleges "[o]n information and belief" that each County or Municipal Defendant "coordinates, combines, or acts in concert with FDLE from time to time," *id.* ¶ 113, and asks the Court to infer from a handful of joint enforcement operations that all forty-eight defendants share a "common purpose and shared law-enforcement objective." *Id.* ¶ 112. But none of those operations is alleged to have involved Miami-Dade County. *See id.* ¶¶ 109–111, 113 n.1 (describing operations with ***other*** jurisdictions). And even if they did, the activities involved—e.g., checking registrants' compliance with state registration laws—fail to further a conspiracy claim because they are undertaken pursuant to state law that directs local entities to work "in conjunction with" FDLE on these matters. *Id.* ¶ 105 (quoting Fla. Stat. § 943.0435(6)).

Cooperation that state law requires is not evidence of an agreement to violate the Constitution. Nor does acting in coordination or concert with the State of Florida make governmental entities co-conspirators. For a § 1983 conspiracy to be actionable, a plaintiff must allege an understanding between would-be conspirators to ***violate constitutional rights***. *Grider*, 618 F.3d at 1260 ("The plaintiff attempting to prove such a conspiracy must show that the parties reached an understanding to deny the plaintiff his or her rights.") (cleaned up); *Gottschalk v. Gottschalk*, No. 10-11979, 2011 WL 2420020, at *6 (11th Cir. June 16, 2011) ("To establish a *prima facie* case of conspiracy under § 1983, the plaintiff must show that the defendants reached an understanding to violate his constitutional rights.").

It is on this point that the conspiracy claim unravels because while collaboration alone is never enough to sustain a § 1983 conspiracy claim, here there is also nothing to suggest collaboration for the purpose of violating constitutional rights. *Walde v. Brown*, No. 21-124, 2022 WL 2670185, at *5 (N.D. Fla. June 16, 2022) (dismissing claim because even though the plaintiff alleged that officers colluded to "fabricate violations that resulted in his imprisonment," that collusion "d[id] not implicate an agreement on Defendants' part to violate [the plaintiff's] constitutional rights."), *report and recommendation adopted,* No. 21-124, 2022 WL 2668538 (N.D. Fla. July 11, 2022). Because FAC failed to allege any facts showing that the County "reached an understanding" with anyone to violate constitutional rights, its conspiracy claim fails.

In the end, Count 2 offers only "'labels and conclusions,' 'conclusory statements,' and 'naked assertions devoid of further factual enhancement,'" which is insufficient to "nudge plaintiff's conspiracy claim across the line from conceivable to plausible." *Davis v. Self*, 960 F. Supp. 2d 1276, 1309–10 (N.D. Ala.), *aff'd,* 547 F. App'x 927 (11th Cir. 2013); *see also Topping v. U.S. Dep't of Educ.*, 510 F. App'x 816, 819 (11th Cir. 2013) (same).

**B. Miami-Dade County Is Not Responsible for Criminal Enforcement**

FAC alleges that the County "enforce[s] the state statutes and ordinances challenged in this suit" in combination with "officials from FDLE." *See, e.g.*, Am. Compl. ¶ 108. That is simply incorrect. The Miami-Dade Sheriff's Office enforces criminal laws and ordinances throughout the County. *See* Fla. Stat. § 30.15; *Diaz v. Miami-Dade Cnty.*, No. 25-20795, 2026 WL 820526, at *1 n.1 (S.D. Fla. Mar. 25, 2026) (noting the January 7, 2025, "transfer of law enforcement services from Miami-Dade County to the Miami-Dade Sheriff's Office."). Because the County cannot enforce criminal laws, and FAC seeks only prospective relief, the conspiracy claim against the County fails for this independent reason.

## COUNT 4 SHOULD BE DISMISSED AS TO MIAMI-DADE COUNTY BECAUSE IT CHALLENGES A STATE STATUTE THE COUNTY NEITHER ENACTED NOR ENFORCES

Count 4 is a challenge to a state statute, and nothing more. It attacks the in-person travel-notice requirements of Florida Statutes § 943.0435(7) and (8)—provisions that require a registrant to report to "the sheriff of the county of current residence," and that the State enforces as a felony. Am. Compl. ¶¶ 163–165; Fla. Stat.

§ 943.0435(7)–(9). Not one paragraph within Count 4 mentions Miami-Dade County or even identifies a County ordinance. Am. Compl. ¶¶ 161–165. For whatever reason, however, FAC's Amended Complaint adds "the County Defendants" to this claim without including a single allegation about any county. Am. Compl. at 62. This is plainly insufficient and warrants dismissal of Count 4 against the County.

### A. FAC Pleads No Claim Against the County in Count 4

As explained *supra*, a complaint that groups all defendants "without specifying which of the defendants are responsible for which acts or omissions," is an impermissible shotgun pleading. *Weiland*, 792 F.3d at 1323. Count 4 is yet another example of how the Amended Complaint fails at the most basic level: it does not identify which of the thirty-two counties sued is a defendant in this claim. Its heading names "the County Defendants," Am. Compl. at 62, but FAC never defines that term. While FAC defines the "County & Municipal Defendants," *id.* ¶ 29, and four subsets of that group, *see id.* ¶¶ 31–34, the term "County Defendants" appears nowhere among those definitions. The County is thus left to guess whether it is a defendant in Count 4 at all, which is precisely the kind of pleading *Weiland* condemns. 792 F.3d at 1323.

More egregiously, FAC never identifies a single County ordinance that regulates travel or requires travel notice. The Miami-Dade provisions FAC cites are a residency restriction, Am. Compl. ¶ 64(a) (citing Section 21-281); a nonexistent code section, *id.* ¶ 80 (citing "Miami-Dade County Code § 21-185"); and the four sections listed in Exhibit 2, [ECF No. 147-2]. None has anything to do with travel. And FAC's prayer

for relief confirms this point. The only travel-related relief FAC seeks is a declaration "that Section 943.0435(7)-(8) unlawfully burdens the right to interstate travel." *Id.* at 67 (Prayer for Relief ¶ c).

A facial challenge must be measured against "the statute as written," *Cafe Erotica of Fla., Inc. v. St. Johns County*, 360 F.3d 1274, 1282 (11th Cir. 2004), and FAC has not pointed to any County law to assess. Because Count 4 pleads no facts and identifies no travel-related law attributable to the County, the County is entitled to dismissal of Count 4.

### B. FAC Lacks Standing to Sue the County in Count 4 Because Its Members' Alleged Travel Injuries Are Neither Traceable to, Nor Redressable by, the County

To establish Article III standing, a plaintiff must show an injury in fact that is "fairly traceable to the challenged action of the defendant" and "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). The injury must be "fairly . . . trace[able]" to "the defendant's conduct, as opposed to the action of an absent third party," and "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (cleaned up). Applying that rule, the Eleventh Circuit has repeatedly held that plaintiffs lack standing to sue a Florida official over a statute that official does not enforce. *See, e.g.*, *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201–05 (11th Cir. 2021) (no standing to sue the Attorney General over a statute she had no authority to enforce);

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253–55 (11th Cir. 2020) (no standing to sue the Secretary of State where county supervisors of elections, not the Secretary, carried out the challenged statute).

Here, the County plays no role in receiving, recording, or prosecuting the travel notices FAC challenges. Section 943.0435(7) directs the registrant to "report in person to the sheriff of the county of current residence." In Miami-Dade County, the sheriff is an independent constitutional officer who operates separately from County government. *See* Fla. Const. art. VIII, §§ 1(d), 6(g)(2). As the Amended Complaint makes clear, FDLE maintains the statewide registry, and the County & Municipal Defendants "do not maintain their own sex-offender registries." Am. Compl. ¶¶ 104–05. A registrant who fails to comply commits a third-degree felony under state law, Fla. Stat. § 943.0435(9)(a), prosecuted by the state attorney. *See* Fla. Const. art. V, § 17 (providing that "the state attorney shall be the prosecuting officer of all trial courts in that circuit"). So, the County plays no role in maintaining the registry, receiving notification from registrants, or prosecuting violations.

It follows that an injunction against the County would accomplish nothing. A registrant in Miami-Dade would still have to report in person to the Sheriff forty-eight hours before leaving the state, and the state attorney could still prosecute him for failing to do so. Relief, if any, would have to run against the State, whose statute imposes the duty and whose agents prosecute the violations. And the State official responsible for the statewide registry is already before the Court as a defendant. *See* Am. Compl. at 62

(naming Commissioner Glass, who heads FDLE, as a defendant in Count 4). Any relief FAC is entitled to on this Count can be obtained from the State; an injunction against the County would be redundant.

Nor do FAC's new "interagency coordination" allegations change this analysis. Am. Compl. ¶¶ 97–114. Those paragraphs speak generically about all thirty-two counties and fifteen cities, and the joint operations FAC describes involved other jurisdictions and concerned registration compliance checks, not travel notice. *Id.* ¶¶ 109–11, 113 n.1. FAC does not allege a single coordinated operation involving Miami-Dade County, much less one involving the travel-notice provisions. The only enforcement-related allegation FAC makes about the County anywhere concerns a social-media post asking residents to report registrants who have "absconded," *id.* ¶ 139, which has nothing to do with Section 943.0435(7) or (8).

Because FAC's members' alleged travel injuries are neither traceable to the County nor redressable by a judgment against it, Count 4 should be dismissed as to the County for lack of standing.

### C. Count 4 Fails to State a Claim Because the County Plays No Role in the Travel-Notice Provision

What Count 4 calls a "violation of the right to travel" is really an attack on a prerequisite to travel codified in a state statute, not a County ordinance. Fla. Stat. § 943.0435(7)–(8); *see* Am. Compl. ¶¶ 163–64. The Florida Legislature alone set the travel-notice requirement's terms, and no local official may alter or waive them. FAC

also fails to identify any County official who has anything to do with enforcement of the travel-notice requirement in § 943.0435(7)–(8). Every aspect of this requirement rests with officials outside the County government: the Legislature set its terms, Fla. Stat. § 943.0435(7)–(9); the independent sheriff meets reporting registrants, Fla. Stat. § 943.0435(7); FDLE maintains the statewide registry, Am. Compl. ¶¶ 104–05; and the state attorney prosecutes violations, Fla. Const. art. V, § 17. FAC does not mention, much less plausibly allege, that the County played any role in enforcing the travel-notice requirement of § 943.0435(7)–(8).

Nor does FAC's allegation that arrestees are detained in county or municipal facilities, *see* Am. Compl. ¶ 103, change this analysis. Count 4 alleges a constitutional injury from the travel requirement itself, not from any detention. In short, the only restriction Count 4 challenges is the State's, and the County is therefore entitled to its dismissal for this additional reason.

**COUNT 5 FAILS BECAUSE THERE IS NO FUNDAMENTAL RIGHT TO LOITER**

In Count 5, FAC claims the Ordinance "criminalize[s] innocent loitering" and is therefore unconstitutional. Am. Compl. ¶ 169. To support that claim, FAC cites to *City of Chicago v. Morales*, 527 U.S. 41 (1999), for the proposition that there is a fundamental right to loiter for innocent purposes. *Id.* ¶¶ 167–169. But *Morales* recognized no such right.

In *Morales*, a plurality decision, the Court held that an ordinance banning gang members from loitering in public places was unconstitutionally vague. 527 U.S. at 45–

51. That ordinance, which defined loitering as "remain[ing] in any one place with no apparent purpose," *id.* at 47 n.2, "reach[ed] a substantial amount of innocent conduct," *id.* at 60. However, only three justices endorsed the view that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 53. That is not enough to establish a fundamental right. *See Entrekin v. Internal Med. Assocs. of Dothan, P.A.*, 689 F.3d 1248, 1257 (11th Cir. 2012) ("We are not bound to apply that premise . . . because it is only a plurality opinion. Three justices of the nine-member court joined that opinion, but twice as many justices did not."); *see also United States v. Sheely*, No. 24-13967, 2026 WL 2349505, at *5 (11th Cir. Aug. 13, 2026) ("Under the Supreme Court's own framework, when it decides a case on a fragmented basis . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (cleaned up). In short then, there is no fundamental right to loiter.

Furthermore, and contrary to what is alleged in the Amended Complaint, what *Morales* had to say about loitering arose "not in the context of a due process analysis but rather in the context of an overbreadth analysis." *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 757 (7th Cir. 2012). And "the only cases cited by the plurality involve the freedom of movement, not the freedom to loiter." *Id.* In any event, "even if [there were] some liberty interest in the right to loiter, it would not follow that this right confers unfettered access to all public places." *Id.*

Even assuming a fundamental right to loiter did exist, it would not be implicated in this case because FAC has not alleged—and cannot allege—that its members are completely barred from "loitering" in Miami-Dade County. To the contrary, the Ordinance only prohibits loitering ***with the intent*** to commit a sexual offense while knowingly within a child safety zone when children are present. *See* Ex. F § 21-285. Such "loitering" can hardly be said to be for innocent purposes.[6] The Ordinance also places certain restrictions on access to parks and child care facilities. *See id.* § 21-284. Those restrictions, however, serve a rational basis and are therefore constitutional.

### A. Section 21-285 Proscribes Only Loitering With the Intent to Commit a Sexual Offense

If there is no right to loiter for "innocent purposes," there certainly is no right to do so with the intent to commit a sexual offense. And that is precisely what § 21-285 seeks to prevent. The provision makes it unlawful for any sexual offender/predator to "loiter or prowl with the intent to commit a sexual offense . . . [w]hile knowingly within a child safety zone when children are present; and . . . [t]o engage in overt conduct that . . . manifests an ***intent*** to commit a sexual offense . . . ." Ex. F § 21-285(a)(1)–(3). A non-exhaustive list of qualifying conduct includes making sexual conversation or remarks to a child; making lewd or sexual gestures to a child; exposing sexual organs to a child; or giving gifts of candy, music, or other items to a child. *Id.* § 21-285(b). And

---

6 "[I]nnocent loitering" is itself a contradiction in terms. *Morales*, 527 U.S. at 113 (Thomas, J., dissenting) ("It is also anomalous to characterize loitering as 'innocent' conduct when it has been disfavored throughout American history.").

prior to effecting an arrest under § 21-285, a law enforcement officer ***must*** first "afford the sexual offender or predator an opportunity to explain his or her presence and conduct." *Id.* § 21-285(c). In fact, there can be no conviction under § 21-285 "if it is proven at trial that the explanation given by the sexual offender or predator is true, and that [he or she] had no intent to commit a sexual offense." *Id.* As such, FAC's characterization that the County's Presence Restrictions "criminalize innocent loitering," *see* Am. Compl. ¶ 169, is flatly wrong.

To put it otherwise, the County's Presence Restrictions "place[ ] no heightened burden on [sexual offenders] than to that which they are already bound—act and intend to act lawfully . . . [sexual offenders] should have no fear of being prosecuted . . . unless they have an otherwise illegal or unlawful purpose, or intent to engage in criminal activity." *McGuire*, 741 F. Supp. 3d at 1197 n.57. Ultimately, the County's Presence Restrictions stand in sharp contrast to the one invalidated as vague in *Morales*, which "require[d] no harmful purpose." 527 U.S. at 62. Because § 21-285 forbids a sexual offender from loitering in a child safety zone with the ***intent*** to commit a sexual offense, *Morales* is inapposite.

### B. There Is No Fundamental Right to Access Parks and Child Care Facilities

Although there is a "constitutionally protected liberty interest, for purposes of due process, to be in parks or on other city lands . . . that are open to the public generally," that "liberty interest is neither fundamental . . . nor limitless." *Peery v. City of*

*Miami*, 977 F.3d 1061, 1071 (11th Cir. 2020) (cleaned up); *see also Doe v. City of Lafayette*, 377 F.3d 757, 769–70 (7th Cir. 2004) (en banc) (the "right to enter the parks to loiter or for other innocent purposes . . . is not unimportant, [but] we cannot say that existing authority establishes that it is 'fundamental'"). Put another way, "there is no constitutional right to use public parks under all conditions and at all times." *Peery*, 977 F.3d at 1071 (cleaned up).

In line with these principles, § 21-284 imposes limited restrictions on a sexual offender/predator's access to parks and child care facilities. Specifically, and with certain exceptions carved out for parents, this provision of the Ordinance makes it unlawful for a sexual offender/predator to: (1) "knowingly be present in a County or municipal park, when a child under the age of sixteen (16) years is present," and (2) "knowingly enter or remain in a child care facility." Ex. F § 21-284(a), (c). Because these restrictions serve a rational basis, the Ordinance is constitutional.

### C. The Presence Restrictions Serve a Rational Basis

Because there is no fundamental right to loiter, or to be in a park or at a child care facility, the Ordinance should only be reviewed to determine whether it "is rationally related to legitimate government interests." *Henry v. Sheriff of Tuscaloosa Cnty.*, 180 F.4th 1294, 1302 (11th Cir. 2026) (cleaned up). "A statute is constitutional under rational basis scrutiny so long as 'there is *any reasonably conceivable state of facts* that could provide a rational basis for the' statute." *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993)). Indeed, "[a]lmost

every statute subject to the very deferential rational basis scrutiny standard is found to be constitutional." *Id.* (citations omitted). And because a law facing rational-basis review bears "a strong presumption of validity, [ ] those attacking [its] rationality . . . have the burden to negate every conceivable basis which might support it." *Beach Commc'ns*, 508 U.S. at 314–15 (cleaned up).

Here, the Ordinance specifically provides that its intent is to serve the County's compelling interest to protect its citizens, particularly children. *See* Ex. F § 21-278(b). Moreover, it contains explicit findings that sexual offenders and predators "present an extreme threat to the public safety," and "are extremely likely to use physical violence and to repeat their offenses," making "the cost of sexual offender victimization to society at large, while incalculable, clearly exorbitant." *Id.* § 21-278(a). Under these circumstances, the Ordinance certainly serves a legitimate government interest. *See, e.g., Smith*, 538 U.S. at 102–03 (state sex offender act "has a legitimate nonpunitive purpose of public safety, which is advanced by alerting the public to the risk of sex offenders in their community.") (cleaned up); *Doe v. Moore*, 410 F.3d 1337, 1345–46 (11th Cir. 2005) (holding that protecting citizens from criminal activity is a legitimate government interest and Florida's sex offender law was rationally related to that end); *Stanley v. Illinois*, 405 U.S. 645, 652 (1972) ("protect[ing] the moral, emotional, mental, and physical welfare of the minor and the best interests of the community . . . are legitimate interests, well within the power of the State to implement."); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1225 (11th Cir. 2023) ("It is well established that states have a

compelling interest in safeguarding the physical and psychological well-being of minors.") (cleaned up).

"Only in an exceptional circumstance will a statute not be rationally related to a legitimate government interest and be found unconstitutional under rational basis scrutiny." *Williams*, 240 F.3d at 948. The stated intent of the County's Ordinance does not fall under such "exceptional circumstances." *See, e.g., Smith*, 538 U.S. at 102 ("The broad categories, however, and the corresponding length of the reporting requirement, are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective."); *Moore*, 410 F.3d at 1345–46 (finding Florida's Sex Offender Act is rationally related to a legitimate government interest); *Litmon v. Harris*, 768 F.3d 1237, 1242 (9th Cir. 2014) (in-person registration requirement satisfies rational basis); *Nelson v. Town of Paris*, 78 F.4th 389, 401 (7th Cir. 2023) (residency restriction ordinance satisfies rational basis).

In short, the County "[has] a compelling interest in safeguarding the physical and psychological well-being of . . . minor[s]." *Eknes-Tucker*, 80 F.4th at 1225 (cleaned up). That interest more than clears the exceedingly low bar for rational basis scrutiny. Accordingly, Count 5 should be dismissed.[7]

---

[7] FAC attacks the Ordinance as unconstitutional not only "as applied to innocent presence" but "in all [its] applications." Am. Compl. ¶ 170. But given that the Ordinance is not unconstitutional as to "innocent loitering," nor does it even implicate such a nonexistent right, it cannot be facially unconstitutional. *See Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir. 2001) ("The general rule is that for a facial challenge to a legislative enactment to succeed, the challenger must establish that no set of circumstances exists under which the Act would be valid.") (cleaned up).

## COUNT 6 SHOULD BE DISMISSED BECAUSE SECTION 21-285 IS NOT VAGUE

FAC includes the County in the category of "Vague Ordinance Defendants," *see* Am. Compl. ¶ 33, which means it is subject to Count 6's void-for-vagueness challenge.[8] Yet FAC gives no indication what exactly is vague about the County's Ordinance. Instead, Count 6 speaks only of "Sections 856.022(3) and 856.022(4)(a) and the Vague Ordinances" as an undifferentiated mass—25 counties and 7 cities, lumped together with the State, none analyzed individually. *Id.* ¶ 33 (identifying the municipalities comprising the "Vague Ordinances" category), ¶¶ 174–175 (failing to differentiate any of the ordinances cited).

Rather than specify which portion of the County's Ordinance is vague, FAC offers a list of terms supposedly found in more than 45 laws across 33 jurisdictions—"loiter," "prowl," "children," "congregating," "regularly congregate," and "vicinity"—that it calls "indefinite." Am. Compl. ¶ 174. Based on these words, FAC apparently hopes the County will surmise its legal challenge. That is backwards: it is FAC's burden to plead what's vague and why, not the County's burden to guess. Off the bat, the Court should dismiss Count 6 against the County for failing to identify the nature of its vagueness claim against it. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that a plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to

[8] Count 6's heading identifies the "Vague Restriction Defendants," Am. Compl. at 64, but the Amended Complaint never defines that term. The term used in the Amended Complaint is the "Vague Ordinance Defendants." Am. Compl. ¶ 33. The County assumes FAC meant the latter.

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

Assuming, then, that FAC intended to challenge § 21-285(a)(1), the portion of the Ordinance that prohibits sexual offenders from "loiter[ing] or prowl[ing]," that provision does exactly what FAC's own Amended Complaint says a loitering ordinance must do to survive: it joins the terms "loiter or prowl" to a specific criminal-intent requirement and a distinct overt act. Am. Compl. ¶ 168. And it goes further still, requiring officers to give an accused an opportunity to explain himself before arrest. Because § 21-285(a)(1) is not vague under any reading of the Ordinance, Count 6 should be dismissed with prejudice as to Miami-Dade County.

### A. Half of the Words FAC Identifies as Vague Do Not Appear in Miami-Dade County's Ordinance

"The inquiry into whether a statute is vague looks only to whether the 'language of the [law] itself' is vague." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (quoting *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir. 2013)). Rather than quote the actual ordinances it challenges, however, FAC cherry-picks terms from several of them to manufacture a claim. Unsurprisingly, FAC's argument falls apart the moment one reads the actual ordinance Miami-Dade County enacted, which does not include three of the six terms FAC challenges: "congregating," "regularly congregate," or "vicinity." Ex. F § 21-285.

In contrast to the indefinite term "vicinity" listed in the Amended Complaint, *see* Am. Compl. ¶ 174, Section 21-285 uses the term "child safety zone," which is defined as a fixed, 300-foot radius from enumerated locations like "schools, child care facilities, parks, and school bus stops." Ex. F § 21-280. A fourth term challenged in the Amended Complaint, "children," does appear in the loitering section of the County's Ordinance, but it's expressly defined as "any person[s] less than sixteen (16) years of age." *Id.* §§ 21-280; 21-285. Therefore, FAC's claim that the "Vague Ordinance Defendants" use words that "give no clear test or criteria to guide law enforcement officers applying the law" is simply untrue as to the County. Am. Compl. ¶ 174.

That leaves only "loiter" and "prowl" as existing undefined terms in the County's Ordinance. But, as explained below, FAC cannot show these terms, particularly in the context of the entire anti-loitering provision, are so ambiguous as to render the Ordinance unconstitutional. For this additional independent reason, the Court should dismiss Count 6 against Miami-Dade County.

**B. Section 21-285 Is Not Unconstitutionally Vague**

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "Put another way, [v]agueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning

and differ as to its application." *SisterSong*, 40 F.4th at 1327 (cleaned up). Because FAC is proceeding with a facial challenge, it "must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982).

Generally, for a facial challenge to succeed in this context, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Consequently, "[f]acial vagueness occurs when a statute is utterly devoid of a standard of conduct so that it 'simply has no core' and cannot be validly applied to any conduct." *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228 (11th Cir. 1982) (quoting *United States v. Powell*, 423 U.S. 87, 92 (1975)). By contrast, "if persons of reasonable intelligence can derive a core meaning from a statute, then the enactment may validly be applied to conduct within that meaning and the possibility of a valid application necessarily precludes facial invalidity." *Id.*

In assessing whether Section 21-285 is void for vagueness, the Court must ask whether the terms "loiter or prowl" are so vague, in *all* applications, that the provision fails to "delineate[ ] its reach in words of common understanding." *Cameron v. Johnson*, 390 U.S. 611, 616 (1968). FAC cannot meet this standard for several reasons. To begin, the terms "loiter or prowl" are not esoteric phrases, ambiguous words, or terms of art. These words have plain and ordinary meanings that are not "so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *Morales*, 527 U.S. at 56 (accepting the lower court's finding that the term loiter "may have a common and

accepted meaning," but finding the definition of that term—"to remain in any one place with no apparent purpose"— in Chicago's ordinance vague because it failed to distinguish between innocent and threatening conduct).

Notwithstanding their ordinary meanings, FAC argues that these terms are ambiguous even in the dictionary: "loiter," it says, means "to remain in or near a place in an idle or apparently idle manner," and "prowl" means to "roam in search or as if in search of whatever may be found"—definitions that "leave unanswered what it is to be 'idle,' or 'restless,' or 'as if in search of' something." Am. Compl. ¶ 69. But if FAC were correct, then no loitering statute anywhere would pass constitutional muster. And that's not the case.

Regardless, the argument misses the mark with respect to Section 21-285, which doesn't criminalize "loitering" or "prowling" in isolation. In Miami-Dade County, a sexual offender violates this provision only by loitering or prowling with the intent to commit a sexual offense and engaging in overt conduct manifesting that intent. Ex. F § 21-285(a). Those requirements do the work FAC claims the dictionary cannot. An officer applying Section 21-285 does not have to decide what counts as sufficiently "idle" or "restless." Rather, he must find loitering coupled with a demonstrated criminal intent and an overt act before making an arrest.

The Supreme Court made this precise distinction in *Morales* when it compared loitering laws that are constitutional because they include intent plus an overt act—like Section 21-285—with those that are unconstitutional because they don't. There, the

ordinance allowed officers to disperse "criminal street gang members" who were "loitering" and defined "loitering" to mean "remain[ing] in any one place with no apparent purpose." *Morales*, 527 U.S. at 47 n.2. The ordinance did not require a person to have criminal intent, nor did it criminalize loitering combined with some other overt act (e.g., to solicit prostitution or sell drugs). *Id.* The Supreme Court held the ordinance was void for vagueness because it "fail[ed] to give the ordinary citizen adequate notice of what is forbidden and what is permitted" and failed to "establish minimal guidelines to govern law enforcement." *Id.* at 60. Yet in doing so, the Supreme Court noted "***the precedent set by a number of state courts that have upheld ordinances that criminalize loitering combined with some other overt act or evidence of criminal intent***." *Id.* at 57 (emphasis added). That is exactly how § 21-285 operates.

Unlike Chicago's ordinance, the County's Ordinance criminalizes loitering or prowling only when supported by an "intent to commit a sexual offense," and it requires distinct "overt conduct" that manifests "an intent to commit" certain enumerated sexual offenses—the very features *Morales* found missing. Ex. F § 21-285(a). And while the ordinance at issue in *Morales* "direct[ed] the police to issue an order without first making any inquiry about their possible purposes," *see* 527 U.S. at 60–61, the County's anti-loitering provision ***requires*** an officer to grant a sexual offender an opportunity "to explain his or her presence and conduct" before making an arrest. Ex. F § 21-285(c). This provision constrains the officer's discretion and even bars conviction where "the officer did not comply with this procedure or if it is proven at trial that the explanation

given by the sexual predator is true." *Id.* More to the point, it provides exactly the kind of "guidelines" the Constitution requires. *Morales*, 527 U.S. at 60.

In sum, assuming FAC intended to challenge § 21-285(a)(1), this provision does exactly what FAC's own Amended Complaint says a loitering ordinance must do to survive a vagueness challenge: it joins the terms "loiter or prowl" to a specific criminal-intent requirement and a distinct overt act and goes further still by requiring officers to afford the accused an opportunity to explain himself before arrest. Am. Compl. ¶ 168 (quoting *Morales*, 527 U.S. at 57). As a result, the County's Ordinance is sufficiently definite and does not encourage arbitrary and discriminatory enforcement. Therefore, the provision is not vague, and the Court should dismiss Count 6 as to the County.

**COUNT 7 FAILS BECAUSE THE ORDINANCE DOES NOT VIOLATE THE FIRST AMENDMENT RIGHT TO FREE SPEECH**

FAC sued a state official, thirty-two counties, and fifteen cities in a single pleading, and somewhere along the way it lost track of which laws belonged to whom. Count 7 accuses Miami-Dade County of precluding sex offenders from approaching "children in a park or playground with intent to 'communicat[e]' about anything 'of a sexual nature.'" Am. Compl. ¶ 80. But that language does not exist ***anywhere*** in the Ordinance. Instead, that language belongs to Lee County, Fort Myers, and Martin County—three of the five defendants FAC names in the same string citation. FAC then pins that language on Miami-Dade County (and Broward County), citing "Miami-Dade

County Code § 21-185."[9] *Id.* As a result, the County is now left to defend a law it neither drafted nor enacted, while justifying the constitutionality of the Ordinance it *did* enact. Therein lies the issue for FAC.

The real issue isn't FAC's carelessness. It is that the provision the County did enact—MIAMI-DADE COUNTY CODE § 21-285—makes it unlawful for sex offenders to loiter and prowl with the ***intent*** to commit a sexual offense; it does not restrict speech at all. The County's Ordinance impacts a sex offender only when he loiters or prowls with the intent to commit a sexual offense against a child under sixteen, while knowingly inside a 300-foot child safety zone, while children are present, and while engaging in overt conduct manifesting a criminal intent to commit a sexual offense. *See* Ex. F § 21-285. As already discussed, "[m]aking sexual conversation or sexual remarks to a child" is but one example of conduct that may be deemed adequate to manifest the requisite intent. *Id.* § 21-285(b)(1). FAC seizes on this list of examples from which intent may be inferred and rewrites it into a ban on political speech, completely ignoring what the Ordinance actually says. And, as explained below, it's one of several reasons why Count 7 should be dismissed in its entirety as to the County.

[9] FAC cites code § 21-185, but that provision does not exist in the Ordinance. The correct section is § 21-285. For purposes of its arguments, the County assumes FAC meant to cite § 21-285.

### A. The Language in the "Gag Ordinances" FAC Challenges Belongs to Three Other Defendants, Not to the County

According to FAC, § 21-285 constitutes a "gag law" because it supposedly prohibits sex offenders from "approach[ing] children in a park or playground with intent to 'communicat[e]' about anything 'of a sexual nature.'" Am. Compl. ¶ 80. In support of this premise, FAC then cites § 21-285, as well as provisions from four other municipalities and alleges that these so-called "Gag Ordinances" fail to define what content "of a sexual nature" means, and thus it could "be interpreted to forbid a wide range of protected political speech," including, *inter alia*, abortion rights, LGBTQIA+ rights, bodily autonomy, and sex education. Am. Compl. ¶ 80. All of which might warrant discussion if the County's Ordinance ever used the phrase "of a sexual nature." *See* Ex. F § 21-285. But it doesn't.

FAC brings a facial challenge to § 21-285, so that is the text FAC's claim must be measured against. *See* Am. Compl. ¶ 179. "When analyzing a facial challenge, [the Court] ***must analyze the statute as written***." *Cafe Erotica*, 360 F.3d at 1282 (emphasis added). This means the facial constitutional challenge must be grounded in the "***actual text***" of the challenged law. *Boos v. Barry*, 485 U.S. 312, 329 (1988) ("In making this assessment, we consider the actual text of the statute as well as any limiting constructions that have been developed."); *Dream Defenders v. Governor of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023) (same, quoting *Boos*); *Field Day, LLC v. County of Suffolk*, 463

F.3d 167, 174 (2d Cir. 2006) ("A 'facial challenge' to a statute considers only the text of the statute itself.").

A plain reading of § 21-285 shows that it does not contain the very words FAC cites as problematic: "communicat[e]" about anything "of a sexual nature." Am. Compl. ¶ 80. That quoted language is lifted from the codes of Fort Myers, Lee County, and Martin County. *See* LEE COUNTY CODE § 19-53; FORT MYERS CODE § 50-143; MARTIN COUNTY CODE § 111.157. In other words, the text FAC quotes does not exist in the County's Ordinance.

To be clear, FAC's ***entire*** First Amendment challenge rests on language that does not exist anywhere in the Ordinance, much less in § 21-285. And FAC identifies no other provision, language, or feature of § 21-285 that purportedly violates the First Amendment. Thus, FAC has not challenged the Ordinance as written at all, and its facial challenge fails as a matter of law. *See, e.g.*, *Sheets v. Renz*, No. 25-01000, Order at 10, ECF No. 39 (M.D. Fla. June 3, 2026) (dismissing facial challenge to ordinance where the plaintiff "misreads the very text he is attacking."); *Sheets v. Davoult*, No. 25-130, 2026 WL 1077639, at *4 (M.D. Fla. Apr. 21, 2026), *rev'd on reconsideration on other grounds*, No. 25-130, 2026 WL 2175095 (M.D. Fla. June 4, 2026) (dismissing facial challenge to ordinance and stating that a plaintiff's "naked assertion of unreasonableness does not even begin to clear [the] high bar" to make such a claim). Because the Amended Complaint contains no cogent theory as to how the County's Ordinance offends the First Amendment, Count 7 should be dismissed as to Miami-Dade County.

### B. The Ordinance Regulates Nonexpressive Conduct, Not Speech, and So It Does Not Implicate the First Amendment

Setting FAC's improper citations aside and assuming that it meant to challenge § 21-285(b)(1)—the provision which refers to "[m]aking sexual conversation or sexual remarks to a child"—Count 7 still fails because § 21-285 regulates conduct, not speech. As such, it does not implicate the First Amendment.

The County's actual Ordinance does not prohibit communications "about anything of a sexual nature," as FAC claims. Am. Compl. ¶ 80. One need only read the Ordinance to know that. Under § 21-285(a), the offense prohibited has three elements: (1) loitering or prowling with the intent to commit a sexual offense against a child under sixteen; (2) while knowingly within a 300-foot child safety zone when children are present; and (3) ***overt conduct*** that manifests an intent to commit a sexual offense. *Id.*

Subsection (b) then supplies a non-exhaustive list of "[c]onduct which may, under the circumstances, be deemed adequate to manifest" the requisite intent to commit a sexual offense. *Id.* That list includes making sexual remarks or lewd gestures to a child, indecent exposure, and giving gifts of candy or money to an unacquainted child as illustrations of circumstantial proof from which a factfinder ***may*** infer intent to commit a sexual offense. Ex. F § 21-285(b)(1)–(3). Subsection (b), therefore, only informs subsection (a)'s intent element—it is not an additional prohibition.

The Amended Complaint reads otherwise though, treating subsection (b)(1)—"[m]aking sexual conversation or sexual remarks to a child"—as a standalone ban on

speech. But the Ordinance does not criminalize sexual conversations or remarks. It identifies such conduct as one example of circumstantial evidence from which the required intent to commit a separate sexual offense may be ***inferred.***

Considering speech as evidence of criminal intent is not the same as prohibiting speech. And, if there were any doubt remaining, subsection (c) definitively closes that door. Absent flight or exigency, a law enforcement officer must, "prior to any arrest," afford the sex offender "an opportunity to explain his or her presence and conduct," and no conviction may follow if the officer does not comply with this procedure, or if the offender's explanation "is true, and that the sexual offender or predator had no intent to commit a sexual offense." *See* Ex. F § 21-285(c).

This safeguard is flatly incompatible with FAC's characterization of the Ordinance. Under § 21-285, a sex offender who says "sex education belongs in schools" or "LGBTQIA+ people deserve equal rights" in a public park, with no intent to commit a sexual offense, cannot be arrested or convicted. FAC's hypothesized parade of forbidden political topics, therefore, is a red herring. Mentioning one of those issues, without doing a great deal more, doesn't manifest an intent to commit a sexual offense against a child. So, the idea that the Ordinance prohibits sexual offenders from "communicat[ing] about ***anything*** of a sexual nature," Am. Compl. ¶ 80 (emphasis added), as FAC alleges, is simply not grounded in the text of § 21-285. Because the Ordinance regulates unlawful conduct and not speech, Miami-Dade County is entitled to dismissal of Count 7.

### C. The First Amendment Is Not Implicated by Nonexpressive Activity

But even if a sexual offender's sexual remarks to a child were treated as part of what triggers criminal liability under § 21-285, FAC's challenge would still fail because the Supreme Court has long held that First Amendment jurisprudence "has no relevance to a statute directed at imposing sanctions on nonexpressive activity." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986); *see also Doe v. City of Lafayette*, 377 F.3d 757, 763 (7th Cir. 2004) (holding that sexual offender's First Amendment rights were not implicated when he was banned from parks because he admitted he could not control his impulse to go to parks looking for children to satisfy his sexual urges and noting that it was "indisputable" that the offender's actions "manifest[ed] absolutely no element of protected expression."). In *Arcara*, the owners of an adult bookstore argued their First Amendment rights were infringed upon when the state closed the store for one year for violation of a public health statute. An undercover investigation had revealed that the store was being used as a meeting place for prostitution. 478 U.S. at 698–700. The Supreme Court held that the First Amendment did not apply because the illicit sexual activity triggering the closure "manifest[ed] absolutely no element of protected expression." *Id.* at 705. The Court noted that First Amendment scrutiny was reserved for two narrow circumstances: where "conduct with a significant expressive element" drew the legal remedy in the first place, or where a statute aimed at nonexpressive activity has "the inevitable effect of singling out those engaged in expressive activity." *Id.* at 706–07. The Court found neither present.

Closer to home, in *Wright v. City of St. Petersburg,* a minister alleged his First Amendment rights were violated when he was issued a trespass warning prohibiting him from re-entering a city park for one year after he obstructed a police investigation and resisted arrest in that park. 833 F.3d 1291, 1296 (11th Cir. 2016). In rejecting his First Amendment claim, the Eleventh Circuit noted that "[s]imply because the trespass warning incidentally burdened [the plaintiff's] First Amendment activities does not mean that [the ordinance] is subject to First Amendment scrutiny, since 'every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities.'" *Id.* (quoting *Arcara*, 478 U.S. at 706). More specifically, the Court found that the ordinance was "directed at imposing sanctions on nonexpressive activity." *Id.* at 1297–98.

*Arcara* and *Wright* establish that the operative question is whether the law sanctions conduct that has a significant expressive element in the first place. What triggers the sanction under § 21-285 is loitering and prowling with the intent to commit a sexual offense against a child—conduct that, like the prostitution in *Arcara* and the obstruction and resisting in *Wright*, manifests absolutely no element of protected expression. Nor does the Ordinance have "the inevitable effect of singling out those engaged in expressive activity." *Arcara*, 478 U.S. at 707. It applies with equal force to the sexual offender who exposes himself, who makes lewd gestures, or who gifts candy and money to a child he has never met—none of which involve expression.

In *Wright*, the plaintiff was excluded from a public park outright, yet the Eleventh Circuit found no First Amendment question to answer. Nothing in § 21-285 precludes FAC's members from standing in the same parks and saying whatever they like there, so long as they are not simultaneously loitering or prowling with the intent to commit a sexual offense. Because Miami-Dade County's Ordinance is directed at nonexpressive criminal conduct, not speech, FAC has not stated a First Amendment claim, and the County is entitled to dismissal of Count 7 with prejudice.

### D. The First Amendment Does Not Prohibit the Evidentiary Use of Speech to Prove Motive or Intent

Beyond sanctioning nonexpressive conduct, "[t]he First Amendment [also] . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Following the Supreme Court's pronouncement, the Eleventh Circuit held that "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent does not violate the First Amendment." *United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (cleaned up). In fact, the Supreme Court repeated this principle in a decision FAC invokes elsewhere in the Amended Complaint: "Specific criminal acts are not protected speech even if speech is the means for their commission." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam)); *see* Am. Compl. ¶ 81 (quoting *Packingham* for a different proposition). That principle is implicated here.

In *Packingham*, the Court struck down a North Carolina statute making it a felony for any registered sexual offender to access social networking websites that permit minors to join, regardless of what the sexual offenders did on those sites and why. 582 U.S. at 109. The Court found the statute swept too broadly, foreclosing a sexual offender's access to what the Court called the modern public square for reasons having nothing to do with the sexual offender's conduct. *Id.* at 107–09. In doing so, however, the Court made clear that: "it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." 582 U.S. at 107.

Such is the case here. Section 21-285 is narrowly tailored exactly the way *Packingham* contemplates: it applies only to a defined class of persons—sexual offenders and predators—within a defined 300-foot child safety zone, and only when children are present. More importantly, it prohibits loitering and prowling with the intent to commit an enumerated sexual offense against a child under sixteen. Applying *Packingham*, the Eleventh Circuit upheld precisely this kind of narrow, conduct-specific restriction. *See United States v. Bobal*, 981 F.3d 971, 976–77 (11th Cir. 2020) (rejecting a *Packingham* challenge to a sexual offender's computer restriction because it was "narrowly tailored" to the offender's own conduct, time-limited, and subject to court-approved exceptions).

In sum, FAC's characterization of Miami-Dade County's Ordinance misses the mark in all respects—it cites the wrong language, misconstrues the Ordinance as

written, and overlooks the critical difference between allowing speech to serve as evidence of criminal intent and prohibiting speech itself. FAC does not identify any portion of the Ordinance that offends the First Amendment. For all these reasons, the County is entitled to dismissal of Count 7 with prejudice.

**AS AN ALTERNATIVE TO DISMISSAL, THE COURT SHOULD SEVER THE COUNTY FROM THIS ACTION**

FAC's claims are barred by res judicata, and the Amended Complaint fails to state any viable cause of action. In the event the Court disagrees, it should nevertheless sever the County under Federal Rule of Civil Procedure 21 because it is improperly joined.

The Amended Complaint, which seeks to declare unconstitutional more than 100 separate state and local provisions enacted by 32 counties, 15 cities, and the State of Florida, divides Defendants into four groups: (1) Residency Restriction Defendants; (2) Presence Restriction Defendants; (3) Vague Ordinance Defendants; and (4) Gag Ordinance Defendants. Am. Compl. ¶¶ 31–34 & Ex. 2. Beyond these FAC-created groupings, the local governments' individual laws appear only in a three-page chart attached as Exhibit 2 to the Amended Complaint.

FAC's approach defies Federal Rule of Civil Procedure 20, which governs joinder, by uniting challenges to widely varying ordinances under broad categories manufactured for FAC's convenience. Because the County's laws do not arise from the same transaction or occurrence as its co-defendants', and the disparate regulatory

schemes share no common question of law or fact, the Court should sever the County from this lawsuit.

### B. The Two-Part Standard for Permissive Joinder

The Federal Rules of Civil Procedure allow a party to join defendants in the same action where:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20. If this two-part standard for permissive joinder is not satisfied, then "[o]n motion or on its own, the court may at any time, . . . drop a party" or "sever any claim against a party." Fed. R. Civ. P. 21.

Factors relevant to severance include: 1) avoidance of delay; 2) judicial economy; 3) fairness; and 4) whether different evidence would be needed for the different parties. *Malibu Media, LLC v. Does 1-28*, 295 F.R.D. 527, 533 (M.D. Fla. 2012); *Hofmann v. EMI Resorts, Inc.*, No. 09-20526, 2010 WL 9034908, at *1 (S.D. Fla. July 21, 2010). Courts have broad discretion to sever parties. *Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1269 (11th Cir. 2013); *Hofmann*, 2010 WL 9034908, at *1 ("It is well-settled that district courts have 'broad discretion in granting a severance.'"); *Malibu Media,* 295 F.R.D. at 530–31 ("Although joinder is 'strongly encouraged' . . . [,] district courts enjoy equally broad discretion to sever parties based on misjoinder").

FAC cannot satisfy either prong of the permissive joinder rule as to Miami-Dade County, so the Court should sever it from this action.

### C. FAC's Claims Do Not Arise Out of a Common Transaction or Occurrence

Regarding the first prong, courts often consider "the scope of compulsory counterclaims in rule 13(a) to govern the meaning of 'transaction or occurrence.'" *Daker v. Holmes*, No. 20-13601, 2022 WL 2129076, at *5 (11th Cir. June 14, 2022). Applying that standard, "logically related events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Id.* (cleaned up). A logical relationship exists if "the same operative facts serve as the basis of [all] claims." *Malibu Media*, 295 F.R.D. at 531 (cleaned up).

There is no common transaction or occurrence here because there is no underlying set of operative facts. The Amended Complaint relies on the far-fetched premise that forty-eight independent governmental entities operated as a unified enterprise to deny constitutional rights merely because they enacted laws on a similar topic. That is, each municipality and county independently enacted local laws regulating sexual offenders within its borders—a routine exercise of local regulatory authority indistinguishable from any other subject of municipal governance. Like with the flawed reasoning of coordination underlying FAC's Eighth Amendment, *Ex Post Facto* Clause, and conspiracy claims, the mere fact that the cities and counties enacted laws pertaining to sexual offenders "is not enough to create a common transaction or occurrence."

*Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) (finding no common transaction or occurrence where immigration plaintiffs sued to have their delayed petitions adjudicated where each "waited a different length of time" and for any number of "numerous reasons").

Not unexpectedly, what is regulated varies widely. For example, the Residency Restriction Defendants regulate how far from certain institutions registrants may live. Miami-Dade County prohibits sex offenders from residing within 2,500 feet of a school; Broward County imposes the same distance but adds public school bus stops, day care centers, parks, and playgrounds. Am. Compl. ¶ 64(a)–(b). Palm Beach County's ordinance features a shorter distance but includes schools, day care centers, parks, playgrounds, and "other place[s] where children regularly congregate." *Id.* ¶ 64(c). Those are the only ordinances the Amended Complaint actually describes; three more sub-paragraphs sweep in the remaining governmental entities listed in column one of Exhibit 2 without elaboration. *Id.* ¶ 64(d)–(f). The Presence Restriction, Vague Ordinance, and Gag Ordinance categories follow the same indiscriminate pattern. Because the Amended Complaint challenges over 100 laws from 48 jurisdictions, there is no consistent set of operative facts this Court can efficiently adjudicate in a single lawsuit.

In a putative class action case raising similar concerns, a court in the Middle District of Tennessee severed all but the lead plaintiff, who challenged multiple "statutes relating to sentencing" within Tennessee. *Harris v. Tennessee*, No. 19-00174,

2022 WL 22951332, at *2 (M.D. Tenn. Oct. 27, 2022).[10] The court held that the claims did not "all arise out of the same transaction of occurrence" because they:

> involve[d] different statutes applied for different purposes at different stages and to different types of convictions. Respective issues (or respective application or consequence of) these different statutes are not appropriately conceived of as amounting to one occurrence or transaction simply because they all relate to sentencing.

*Id.* Likewise, all defendants here enacted statutes relating to sexual offenders, but those statutes differ and apply in different ways to different issues, so there is no common underlying occurrence or transaction. As one of dozens of governmental entities, Miami-Dade County is improperly joined, and the Court should sever it. *Daker*, 2022 WL 2129076, at *6 (affirming district court's decision to sever "claims against the three groups of defendants [because they] were not part of the same transaction or occurrence").

### C. There Is No Common Question of Law or Fact in This Case

FAC also fails the second prong of permissive joinder because, given the significant differences in what conduct each defendant regulates and how, no question of law or fact is common to the defendants. *Harris* is again instructive. There, the court found the second prong lacking because "[n]ot all plaintiffs are challenging the same

---

[10] Although *Harris* involved the misjoinder of plaintiffs as opposed to defendants, the analysis is the same because the two subsections of the Rule feature identical language. *See* Fed. R. Civ. P. 20(a)(1)(A) (authorizing joinder of plaintiffs whose right to relief arose out of the same "transaction, occurrence, or series of transactions or occurrences.").

statutes, and apparently not all plaintiffs are challenging the failure to address recalculation requests." 2022 WL 22951332, at *3. Its observation is particularly relevant here, where FAC raises various constitutional challenges to the County's Ordinance:

> Whether a particular statute is unconstitutionally vague constitutes one question of law; whether several respective different statutes are unconstitutionally vague constitute multiple questions of law. And whether a statute violates the Due Process Clause (due to vagueness) is one question of law, and whether a statute (the same or a different statute) violates the Eighth Amendment (as incorporated into the Fourteenth Amendment) is a different question of law.

*Id.*

This case presents the same problem. For example, FAC would have this Court declare sixty-one differing "Residency Restriction Ordinances" unconstitutional under the Eighth Amendment in one fell swoop, without analyzing the individual laws. Likewise, Count 7 seeks a declaration that thirteen ordinances violate the First Amendment, five of them because they restrict sexual offenders from certain holiday-related activities; Miami-Dade County's Ordinance has no such provision. Am. Compl. ¶ 81.[11] Similarly, Count 6 alleges that forty-seven ordinances are void for vagueness

[11] FAC's other problem with the so-called "Gag Ordinance Defendants" is that they regulate speech by prohibiting registrants from communicating matters of a "sexual nature" to children visiting parks and playgrounds. Am. Compl. ¶ 80. Setting aside that such conduct would never sustain a First Amendment claim, as the County argued *supra*, its Ordinance does not regulate ***speech*** at all. Instead, it specifies that "[m]aking sexual conversation or sexual remarks to a child" is ***one possible indicator*** of an intent to commit a sexual offense—a required element of the loitering statute applicable to sexual offenders/predators in Miami-Dade County, not a standalone speech ordinance. Ex. F § 21-285. This is another example of the complexity of the different statutes FAC indiscriminately grouped into categories having no constitutional significance.

based on six terms FAC deems ambiguous, but most either don't exist in the County's Ordinance or are defined therein. *Id.* ¶ 174. Because the ordinances lack uniform language, the Court cannot possibly assess their constitutionality en masse. *Coughlin*, 130 F.3d at 1351 (concluding that the plaintiffs fell short on the common question of law or fact prong because "what may constitute undue delay in one case may not be so in another case."); *see also Fleming v. Home Depot U.S.A., Inc.*, No. 96-6560, 1998 WL 1674544, at *3 (S.D. Fla. July 8, 1998) (granting a defendant's motion to sever because, even though all claims arose under Title VII, there still wasn't a "common question of law").

What FAC frames as a single, sweeping challenge in each count is actually a patchwork of independent local laws under distinct municipal frameworks. Resolving FAC's claims thus requires analysis of not one overarching legal question but individualized inquiries into each defendant's unique statutory scheme—inquiries FAC's misjoinder makes impossible. *See Coughlin*, 130 F.3d at 1351 (granting motion to sever because the fact that claims arise under the same general law "does not necessarily establish a common question of law or fact."); *see also Ravin v. Hockman*, No. 06-22492, 2007 WL 29248, at *4 (S.D. Fla. Jan. 3, 2007) (finding misjoinder because "it is abundantly clear that Plaintiffs cannot rely on a 'one size fits all' approach" to their claims.). FAC cannot establish the common question of law or fact needed to join Miami-Dade County.

### D. Severance Would Promote Judicial Economy, the Interests of Justice, and the Intent of Rule 20

Finally, continuation of this lawsuit in its current form would be excessively unwieldy. "Rule 20 is designed to promote judicial economy, and reduce inconvenience, delay, and added expense." *Coughlin*, 130 F.3d at 1351. These "policy considerations would be undermined, rather than promoted, by permitting this action to proceed" as a "mega case" against 48 defendants. *Ravin*, 2007 WL 29248, at *5; *Hofmann*, 2010 WL 9034908, at *3 (granting severance because, among other reasons, the case was not "manageable in its current configuration."). Joining so many defendants does not serve judicial economy because the divergent issues will generate "multiple unrelated motions and defenses." *Malibu Media,* 295 F.R.D. at 533. Severance will also avoid significant logistical and case management burdens that would otherwise stymie the litigation in its present form. *Id.* at 535 (granting severance in case with 28 named defendants). The Court should sever Miami-Dade County from the case.

## CERTIFICATE OF CONFERRAL

Undersigned counsel conferred, in accordance with N.D. Fla. L.R. 7.1(B)–(C), with counsel for Plaintiff Florida Action Committee, Inc., who opposes the County's motion to sever.

## CERTIFICATE OF WORD LIMIT

Per the requirements of Local Rule 7.1(F), undersigned counsel states that the total word count of this Motion is **15,960** words.

Dated: October 9, 2026

Respectfully submitted,

**GERALDINE BONZON-KEENAN**
Miami-Dade County Attorney
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, FL 33128
Telephone: (305) 375-5151
Facsimile: (305) 375-5611

By: */s/ Erica S. Zaron*
Erica S. Zaron, Esq.
Florida Bar No. 0514489
E-mail: zaron@miamidade.gov

By: */s/ Jennifer L. Hochstadt*
Jennifer L. Hochstadt
Florida Bar No. 56035
E-mail: jennifer.azar@miamidade.gov

By: */s/ Fabiana Cohen*
Fabiana Cohen
Fla. Bar No. 119732
cohenf@miamidade.gov

By: */s/ Michael A. Muñoz*
Michael A. Muñoz
Fla. Bar No. 1003076
michael.munoz@miamidade.gov

By: */s/ Armando R. Méndez*
Armando R. Méndez
Florida Bar No. 1010764
E-mail: armando.mendez2@miamidade.gov

Assistant County Attorneys
*Counsel for Miami-Dade County*